Filed 6/1/17 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SAN DIEGO STATE UNIVERSITY RESEARCH FOUNDATION et al.,<br><br>    Defendants and Respondents;<br><br>INVESTIGATIVE NEWSOURCE et al.,<br><br>    Real Parties in Interest and Respondents. | D069189<br><br><br><br>(Super. Ct. No. 37-2015-00011951-CU-MC-CTL)<br><br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br><br><br>NO CHANGE IN JUDGMENT |


THE COURT:

It is ordered that the opinion filed on May 3, 2017, be modified as follows:

1. On page 32, before the second full paragraph that begins "The allegations in SDOG's lawsuit" insert the following paragraphs:

> Recently, in *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057 (*Park*), the California Supreme Court clarified that "[a] claim arises from protected activity when that activity underlies or forms the basis for the claim."  (*Id.* at p. 1062.)  "'[T]he

defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech.'" (*Id.* at p. 1063, italics omitted.) "[T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.'" (*Ibid.*) Accordingly, "'[t]he only means specified in section 425.16 by which a moving defendant can satisfy the ["arising from"] requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) . . . .'" (*Ibid.*, italics omitted.) "[I]n ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by defendant supply those elements and consequently form the basis for liability." (*Ibid.*)

Here, SDOG's claim under Government Code section 1090 requires it to show Hearn was financially interested in a contract made by her in her official capacity as a state employee. (Gov. Code, § 1090, subd. (a).) Moreover, in determining whether its claims are based on protected activity, SDOG concedes its entire complaint is "based on" the "execution of agreements by Respondents." Thus, the specific elements of SDOG's claims depend on the existence of the 2012 Agreement and 2015 lease. These contracts that SDOG challenges are *not* merely evidence of liability, nor are they merely a step leading to some different act for which liability is asserted. (See *Park, supra,* 2 Cal.5th at p. 1060 ["a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted"].) Rather, SDOG's complaint alleges these agreements are "illegal[]" and, therefore, asks the court to enter judgment declaring each of them to be "void." SDOG could not have omitted from its complaint allegations regarding the 2012 Agreement and 2015 lease and still state the same claims.

Moreover, SDOG's assertion that the challenged contracts are merely a step leading to potential newsgathering and not in themselves newsgathering is incorrect. The contracts dictate the way in which inewsource and KPBS gather and publish the news. The contracts require inewsource to deliver to KPBS specific news stories and to make their reporters available to KPBS in exchange for office space. Accordingly, because the protected activity—here, contracts for newsgathering, news collaboration, and news reporting to the public—are in themselves elements of the challenged claims,

2

the trial court correctly determined SDOG's lawsuit arises from defendants' protected activity. (See *Park, supra,* 2 Cal.5th at p. 1068.)

2. On page 32, at the start of the first sentence of the existing second full paragraph, insert the word "Further," so the sentence now reads:

Further, the allegations in SDOG's lawsuit make clear the injury-producing conduct underlying its claims consists of the contracts between inewsource and KPBS that govern the process in which these defendants jointly engage in newsgathering and reporting news to the public.

3. On page 33, line 7, change the citation *from* "section 426.16, subdivision (e)" *to* "section 425.16, subdivision (e)."

4. On page 35, before the first full paragraph that begins "In a related argument" insert the following new paragraphs:

Quoting *Park, supra,* 2 Cal.5th at p. 1060, SDOG asserts "'a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.'" SDOG contends we must, therefore, "segregate the negotiating and entering into the Agreements from the subject of the Agreements." SDOG argues the anti-SLAPP analysis would be the same regardless of the content of the challenged contracts. SDOG asserts, "As an example, the Agreements at issue here would be equally outside the scope of the anti-SLAPP statute if Ms. Hearn were a licensed building contractor and had used her faculty position at SDSU to procure a long-term construction contract between SDSU and her construction company."

SDOG's argument fails because in determining whether the challenged contracts are protected under section 425.16, subdivision (e)(4), the fact these contracts are for gathering and delivering news stories and not some other purpose matters. The Supreme Court's explanation in *Park, supra,* 2 Cal.5th 1057 of the decision in *Hunter, supra,* 221 Cal.App.4th 1510 explains why. In *Hunter,* the defendant television station argued that (1) the station itself engaged in speech on matters of public interest through its news and weather

3

broadcasts, and (2) the decision as to who should present that message was thus conduct in furtherance of the station's protected speech on matters of public interest. (See discussion in *Park, supra,* at pp. 1071-1072 .) The instant case is effectively indistinguishable: Inewsource is a news organization that publishes news stories of public interest, and its decision of whom to partner with to deliver the news (i.e., KPBS, under the challenged contracts) is conduct in furtherance of its protected speech on matters of public interest. Under section 425.16, subdivision (e)(4), protected activity includes "any other conduct in furtherance of the exercise of the . . . constitutional right of free speech in connection with a public issue or an issue of public interest." SDOG is not seeking to void a contract to make widgets or to construct a building. It is seeking to void contracts that directly affect the content of news stories the public receives. That protected content brings this case within section 425.16, subdivision (e)(4).

The analysis might well be different if SDOG sought to void the hypothetical construction contract it posits, or any number of other hypothetical contracts that do not involve newsgathering and reporting. However, this case, like *Hunter, supra,* 221 Cal.App.4th 1510, involves protected newsgathering and news reporting. Inewsource is not a construction company. It is in the news reporting business, and the contracts SDOG challenges shape the way inewsource and KPBS gather, produce, and report the news.

     5. On page 36, footnote 17 is deleted and a new footnote 17 is inserted in its place

so footnote 17 now reads:

[17] Under section 425.16, subdivision (e)(4), conduct in furtherance of the exercise of free speech rights is protected only where such conduct is "in connection with a public issue or an issue of public interest." In granting the motions to strike, the trial court determined "this action arises from protected activity under [section] 425.16." On appeal, the trial court's order is presumed correct and "'it is the appellant's burden to affirmatively demonstrate error.'" (*Ruelas v. Superior Court* (2015) 235 Cal.App.4th 374, 383.) "'To demonstrate error, [the] appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error.'" (*Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1457.) However, as inewsource notes, SDOG does not address the public interest prong of section 425.16, subdivision (e)(4) in its opening brief discussion of whether its claims arise from protected activity. Accordingly, the issue is forfeited. (*H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 15.)

4

There is no change in the judgment.

Plaintiff's petition for rehearing is denied.

HUFFMAN, Acting P. J.

Copies to:  All parties

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGANS FOR OPEN GOVERNMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SAN DIEGO STATE UNIVERSITY RESEARCH FOUNDATION et al.,<br><br>    Defendants and Respondents;<br><br>INVESTIGATIVE NEWSOURCE et al.,<br><br>    Real Parties in Interest and Respondents. | D069189<br><br><br>(Super. Ct. No. 37-2015-00011951-CU-MC-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Leibold McClendon & Mann and John G. McClendon for Plaintiff and Appellant.

Butz Dunn & DeSantis, Higgs Fletcher & Mack, Douglas M. Butz and Joy L. Homze for Defendants and Respondents.

Sheppard, Mullin, Richter & Hampton, Guylyn R. Cummins and Valerie E. Alter for Real Parties in Interest and Respondents.

A free press is a foundation of citizen participation in government because the press informs people about issues of public concern and provides a place for debate about public issues. A lawsuit filed primarily to chill the valid exercise of free speech is called a SLAPP suit and, if without merit, such an action may be dismissed early under Code of Civil Procedure[1] section 425.16 in what is commonly known as an anti-SLAPP motion.[2]

In this anti-SLAPP case, investigative newsource (inewsource), an independent, nonprofit journalism organization, entered into contracts with KPBS, San Diego's public radio and television station, to gather and produce news stories with and for KPBS, in exchange for the right to use KPBS offices, media equipment, and related news facilities. KPBS is a department of San Diego State University (SDSU), and inewsource and KPBS have jointly created hundreds of news stories.

In February 2015 inewsource began publishing articles critical of attorney Cory Briggs. For example, one was entitled "Cory Briggs' Land Deals Raise Ethical Legal Questions" and another was called "San Diego Attorney's Environmental Lawsuits Could Be Tainted by Conflict of Interest."

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

[2] "'SLAPP' is an acronym for 'strategic lawsuit against public participation.'" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).)

2

After inewsource published about a dozen more critical stories about Briggs, San Diegans for Open Government (SDOG)—an entity inewsource reported is controlled by Briggs—sued inewsource, along with its founder, Loretta Hearn, and also SDSU, California State University (CSU), and San Diego State University Research Foundation (SDSURF).

The gist of SDOG's complaint is the contracts between KPBS and inewsource violate statutory prohibitions on self-dealing involving public funds because Hearn was allegedly influencing both sides of the transaction—for SDSU as a faculty member, and for inewsource as its executive director. SDOG also alleges inewsource and Hearn misappropriated the names KPBS and SDSU.

Asserting SDOG's lawsuit is based on the exercise of their constitutionally protected speech rights and lacked merit, Defendants[3] brought anti-SLAPP motions. The court granted the motions.

SDOG appeals, contending the anti-SLAPP statute does not apply because (1) its lawsuit is a public interest lawsuit, exempt from the anti-SLAPP law under section 425.17, subdivision (b); and (2) the exception to that exemption for media defendants under section 425.17, subdivision (d) is inapplicable because its lawsuit has "nothing to do with stopping news reporting" but is instead directed to stopping "self-dealing by a public employee."

---

[3] "Defendants" refers to the entities and persons SDOG named as defendants and respondents, together with those named as defendants and real parties in interest, in their complaint.

3

Alternatively, SDOG asserts that if the anti-SLAPP statute applies, the order should be reversed because (1) its lawsuit is not directed at protected activity; and (2) even if it is, SDOG established a probability of prevailing.

We affirm. Reporting news is protected speech. (*Hunter v. CBS Broadcasting, Inc.* (2013) 221 Cal.App.4th 1510, 1521 (*Hunter*).) News stories addressing issues of public interest do not arise out of thin air. They often require newsgathering using offices, internet access, studios, and production services. Providing office space and related newsgathering facilities in exchange for investigative news stories furthers protected speech. SDOG's lawsuit is therefore squarely within the anti-SLAPP statute, which protects not only speech, but also "*conduct* in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e), italics added.)

We reject SDOG's assertion that the anti-SLAPP statute does not apply because its lawsuit targets unlawful self-dealing, not protected speech. SDOG's argument improperly conflates distinct issues of conduct and motive. In determining whether the anti-SLAPP statute applies, the appropriate focus is on the alleged injury-producing conduct (here, the KPBS-inewsource contracts), and not the defendant's alleged wrongful motive for engaging in that conduct (here, alleged self-dealing). (*Hunter, supra,* 221 Cal.App.4th at pp. 1521-1523.)

Moreover, SDOG's reliance on the public interest exemption to the anti-SLAPP statute in section 425.17, subdivision (b) is unavailing. That exemption does not apply to actions such as this one against news media engaged in newsgathering conduct.

4

(§ 425.17, subd. (d)(1); *Major v. Silna* (2005) 134 Cal.App.4th 1485, 1496-1497 (*Major*).)

Last, SDOG's claims fail on the merits because SDOG offered no admissible evidence to support its claims. SDOG's attempt to fill the evidentiary void by relying on allegations in its verified complaint is insufficient as a matter of law. (*Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 679 (*Brodeur*).)

FACTUAL AND PROCEDURAL BACKGROUND

A. *The News Media Parties*

Hearn has been a professional journalist since 1974. In 2009 she founded inewsource, which creates investigative news stories on public issues.

KPBS is a media entity operating as a public service of SDSU. KPBS, with broadcast facilities on the SDSU campus, delivers news and entertainment programming through television, radio, and digital media.

SDSURF is a nonprofit corporation and a separate legal entity from SDSU. For over 34 years, SDSURF has provided KPBS with financial accounting, tax reporting, and administrative support.

In 2010 KPBS began publishing inewsource news stories. Reporters for these two organizations also began working together on stories of public interest.

B. *The 2012 Agreement for Collaboration Between Inewsource and KPBS*

In the fall of 2011, KPBS remodeled its newsroom and began a nightly news television show. Hearn asked KPBS's station manager, Deanna Mackey, about moving inewsource into the remodeled KPBS newsroom because inewsource was looking for a

5

reliable audience for its investigative news. Hearn's proposal interested KPBS, which was looking for more investigative news content.

In 2012 KPBS and inewsource entered into a contract under which KPBS agreed to provide inewsource newsroom space to allow inewsource reporters to work closely with KPBS editors, reporters, and producers on collaborative work (the 2012 Agreement).[4] In exchange, inewsource agreed to give KPBS all of its news content for distribution on radio, television, and the Internet. KPBS characterizes this relationship with inewsource as a "partnership" that contemplates "joint story telling."

Under the 2012 Agreement, KPBS agreed to provide inewsource with offices, furniture, studios and production areas, telephone and internet connections, and news gathering equipment. KPBS also agreed to invite inewsource employees to daily news meetings.

In exchange, inewsource agreed to provide KPBS with 10 "substantial data driven stories" during the term and one "Watchdog feature per month," plus a "[w]eekly data brief on a topic of interest to KPBS' audience." Inewsource also agreed to provide reporters to KPBS and to provide KPBS access to its databases.

KPBS did not competitively bid the 2012 Agreement. Mackey, KPBS's station manager who participated in drafting the 2012 Agreement, stated such a contract would "never be subject to open bidding" because "content is qualitative" and "[p]artnerships between news organizations require trust . . . ." Mackey stated KPBS "only partners with

---

[4]    The 2012 Agreement also states SDSURF is a party to that agreement and the "contracting and fiscal agent for KPBS."

news organizations whose accuracy and content have proven to be trustworthy, such as inewsource." Vince Petronzio, associate general manager for business and financial affairs at KPBS, similarly stated that "KPBS does not solicit open bids for content-based contracts." He explained, "In fact, because content is unique and qualitative, it would never be subject to open bidding. . . . KPBS receives significant value from its partnership with inewsource because inewsource stories enhance the coverage that KPBS can provide to its audience." He added, "The partnership between KPBS and inewsource is definitely a value-for-value partnership."

In a declaration, Hearn asserted she negotiated the 2012 Agreement only on behalf of inewsource. Mackey and Suzanne Marmion, director of news and editorial strategy for KPBS, negotiated the 2012 Agreement for KPBS. Neither Mackey nor Marmion has any financial interest in inewsource. In 2012, although Hearn occasionally volunteered as a guest lecturer for SDSU's school of journalism, she was not employed by SDSU and held no executive or managerial role at SDSU.

Hearn's declaration states she has never been a KPBS board member or KPBS employee and has "never been in a position to influence [the KPBS] decision-making process or outcome in any way." She has never been a tenured or tenured-track SDSU professor, nor a department head, advisory board member, committee member, director, officer, or department chairperson. Hearn has never been employed by SDSURF.

C. *The 2015 Extension and Lease*

In 2015 inewsource and KPBS extended the 2012 Agreement (the 2015 extension).[5] They also entered into a new lease (2015 lease) under which KPBS leased office space, conference rooms, studios, and production areas to inewsource for its reporters to use "for the benefit of securing investigative news content for KPBS." Rent under the 2015 lease was only one dollar; however, KPBS's station manager stated KPBS received "significant value" from this agreement because "inewsource stories enhance the coverage that KPBS can provide to its audience."

Hearn states she negotiated the 2015 extension and 2015 lease only on behalf of inewsource. Mackey and Marmion negotiated on behalf of KPBS. In 2015 Hearn was an adjunct professor of journalism at SDSU, teaching a three-unit class. SDSU paid Hearn for her teaching time at its standard rate, and she received no other benefits from SDSU. Hearn's declaration states she did not occupy any position of control or decision-making authority with SDSU, SDSURF, or KPBS.

D. *Nature of KPBS and Inewsource Collaboration*

Inewsource and KPBS have jointly created and distributed more than 285 stories. In most, inewsource reports the news, with input from KPBS editors and using KPBS videographers. In other cases, KPBS reporters do the reporting and inewsource reporters edit. Occasionally, KPBS and inewsource collaborate to jointly report stories. In all

---

[5]    SDSURF is also a party to the 2015 extension and lease agreement.

these situations, inewsource reporters work closely with KPBS editors and producers on content for KPBS.

E. *Inewsource Articles About Briggs*

In February 2015 inewsource began publishing uncomplimentary stories about Briggs. For example, one was entitled, "San Diego Attorney's Environmental Lawsuits Could Be Tainted by Conflict of Interest." There, inewsource reported that Briggs's wife, Sarichia Cacciatore, was listed as a project manager on a contract her employer had with a government entity at the same time Briggs was suing that entity over environmental matters. Briggs responded by stating on his website, "My wife has a job, and I have a job. We don't talk about or share client confidences, and we take measures to avoid creating any conflicts. There isn't anything illegal, unethical, or even unusual about this either."

The next day, in an article entitled, "Document Links Briggs' Wife to His Law Business," inewsource reported that Cacciatore was listed as vice president of Briggs's law firm at the same time she worked on projects for government agencies Briggs was suing.

On February 25, 2015, inewsource reprinted a letter Briggs posted on his website, defending his conduct and stating, "My clients aren't wealthy corporations. There are people who have to fight and need a lawyer to represent them but often can't pay right away. I still fight for them."

On March 3, 2015, inewsource published three more articles about Briggs. These were entitled "Behind the Briggs Investigation," "Helix: Briggs' Wife Did Not Disclose

9

VP Role in His Law Firm," and "Contested Transcript of San Diego Attorney Cory Briggs' Wife Released."

In these articles, inewsource reported that Cacciatore was employed by an environmental company that has done work for the City of San Diego (the City)—and that Briggs sued the City regarding one of these projects. Inewsource reported, "Records released Monday confirm Cory Briggs' wife was vice president of the Briggs Law Corp[oration] for the past 'twenty years,' which means she was an officer of the law firm he used to sue the [City] at the same time she worked for a company on contract with the city." Briggs responded, stating Cacciatore was vice president of his law corporation "for reasons having nothing to do with running the firm and everything to do with things like estate planning . . . ."

On March 10, 2015, inewsource reported that Briggs had sued the City about at least one project Cacciatore worked on "directly."

On March 30, 2015, Cacciatore and Briggs wrote to KPBS "to give you notice of our demand, and to make that demand, for correction and retraction of false, inaccurate, and/or misleading reporting that may have been disseminated by KPBS . . . ." Inewsource and KPBS responded, stating it was "unaware of any false fact" in its story.

On April 7, 2015, inewsource reported that the environmental firm employing Cacciatore had agreed to pay the City $143,000 to resolve the potential conflict of interest claim. Earlier, Briggs wrote, "'There isn't anything illegal, unethical or even unusual'" about Cacciatore's employment and relationship to Briggs.

10

One day later, inewsource published another article about Briggs, reporting Cacciatore played a "key role" in an environmental review of a project near the Mexican border. The article states Briggs filed a lawsuit alleging inadequacies in that project's analysis of biological impacts, and Cacciatore—vice president of Briggs's law firm—was the project's biologist. Inewsource also reported that Briggs had sued "at least 15 government agencies" that had contracted with the environmental firm employing Cacciatore. The article states Briggs operates through nonprofit corporations, including SDOG, which are actually run by Briggs's associates, including his cousin. The article states, "Experts in legal ethics have told inewsource the connection between Briggs and [his wife] is a 'horrible' and 'problematic' conflict of interest." The article explains:

"Briggs' lawsuits against the [City] have cost taxpayers a significant amount of money over the years. But there was an undisclosed conflict of interest behind at least two of them, posing ethical and legal issues that recently resulted in a taxpayer settlement."

On April 9, 2015, inewsource published Cacciatore's demand for correction and retraction, along with inewsource's lawyer's point-by-point response, refuting Briggs's assertions. The same day, SDOG filed the instant action. However, SDOG did not serve Hearn with the lawsuit until June 2015.

F. *Inewsource Publishes Another Article About Briggs*

In the meantime, in late May 2015, inewsource published another uncomplimentary article about Briggs entitled "Briggs-Associated Nonprofits Flout State, Federal Laws." There, inewsource reported, "Briggs and his law firm have sued on behalf of more than 30 charitable nonprofits, almost all of which he and his family helped

11

create."  Inewsource also reported that SDOG's officers have "stated under oath that Briggs Law Corp[oration] oversees and pays for nearly every aspect of the group's operation" and that SDOG "does not have a penny to its name":

"According to depositions and other court filings, Briggs and his law firm hold and maintain all the group's [SDOG's] corporate records, file and pay for its lawsuits, its annual registration fees and filings with the state and federal governments, control its Facebook and Twitter accounts; and collect all settlements and judgment when the group prevails in court.

"[SDOG] doesn't have a penny to its name—nor has it recorded any revenue or expenses with the federal or state agencies, according to government records."

Responding, SDOG's corporate secretary explained SDOG has no checking or savings account because it wants to operate "as simply and cleanly as possible."  He also explained that when SDOG loses a case, Briggs does not get reimbursed for his time or expenses, and he is willing to "risk substantial loss to fight the well-funded groups he takes on for us."

G.  *SDOG's Complaint*

The crux of SDOG's lawsuit here is its assertion the 2012 Agreement and 2015 lease violate prohibitions on self-dealing and use of public funds for private benefit, and therefore are void.  The first cause of action is entitled, "Illegality of 2012 Agreement." SDOG alleges that agreement violated Government Code section 1090 because Hearn was then employed by SDSU and therefore had a financial interest on both sides of the

12

transaction.[6] SDOG also alleges the 2012 Agreement should have been subject to a competitive bid process just like a construction contract or other public works project.

SDOG's second cause of action alleges the 2015 lease (referred to in the complaint as the 2014 lease) was negotiated or executed by Hearn in her official capacity as a SDSU employee while she had a conflicting financial interest as inewsource's executive director. SDOG alleges Hearn used her position as a SDSU lecturer to "secure approval" of the 2012 Agreement and 2015 lease for the benefit of inewsource, in violation of Government Code section 8314.[7] SDOG also alleges inewsource infringed KPBS's and SDSU's trademarks by using them without permission and without paying compensation.

H. *Anti-SLAPP Motions*

Inewsource and Hearn filed an anti-SLAPP motion, accompanied by a request for judicial notice, 81 documentary exhibits, and declarations of Hearn, Norma Clark (SDSURF's associate executive director of facilities planning and management), Mackey, and Brad Racino, an inewsource reporter.

Inewsource and Hearn asserted SDOG's complaint attacked protected activity under the anti-SLAPP statute; namely, the partnership between KPBS and inewsource for

---

[6]     Government Code section 1090, subdivision (a) provides in part:  "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."

[7]     Government Code section 8314, subdivision (a) provides:  "It is unlawful for any elected state or local officer, including any state or local appointee, employee, or consultant, to use or permit others to use public resources for a campaign activity, or personal or other purposes which are not authorized by law."

13

gathering and reporting news. They also presented admissible evidence showing SDOG's claims lacked merit. For example, Hearn's declaration states:

"[SDOG] alleges that the 2012 Agreement . . . 'was negotiated and/or executed by one or more CSU, SDSU, and/or SDSU[R]F officials or employees in their official capacities who, at the time of the contract's negotiating and/or execution, had a financial interest in the contract in violation of Government Code section 1090 and other conflict-of-interest laws, including but not limited to [Hearn].' This statement is false. I negotiated the 2012 Agreement between inewsource and KPBS on behalf of inewsource. I did not negotiate on behalf of KPBS and had no role whatsoever—much less authority, decision-making power, or influence—on the KPBS side of the negotiations. Deanna Mackey, KPBS station manager, and Suzanne Marmion, director of news and editorial strategy, negotiated on behalf of KPBS."

Hearn similarly refuted SDOG's allegations she received personal benefits from the 2015 lease. Asserting "Briggs controls SDOG as his alter ego," Hearn and inewsource sought an award of attorney fees "jointly" against SDOG and Briggs.[8]

The Trustees of the California State University (Trustees) and SDSURF (collectively University defendants) also filed an anti-SLAPP motion.[9] The University defendants accompanied their motion with documentary exhibits and declarations of Bob Wolfson (SDSURF's executive director), Petronzio (KPBS associate general manager of business and financial affairs), Mackey (KPBS station manager), and Hearn.

---

[8]    SDOG has filed a request for judicial notice of a March 18, 2016 order, where the trial court denied Defendants' request for an award of attorney fees jointly and severally against SDOG and Briggs. As explained *post*, it is unnecessary for us to decide the alter ego issue on appeal, and we express no opinion on that issue. Accordingly, SDOG's request for judicial notice, filed June 1, 2016, is denied because the March 18, 2016 order is not relevant to any issue on appeal. (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 701, fn.1 (*Scruby*).)

[9]    The Trustees' motion states SDOG erroneously sued them as CSU and SDSU.

14

The University defendants asserted that SDOG's complaint was governed by the anti-SLAPP statute because the action is based on agreements for collaborative news reporting. They also asserted the public interest lawsuit exemption to the anti-SLAPP statute in section 425.17, subdivision (b) did not apply because under section 426.17, subdivision (d) and *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050 (*Ingels*), news gathering and reporting are exceptions to the public interest lawsuit exemption. On the merits, the University defendants asserted SDOG's claims fail because Hearn did not make the 2012 Agreement or 2015 lease in her "official capacity" as an SDSU adjunct professor, and she had no control or decision-making authority for SDSU. They also asserted SDOG's trademark infringement claim failed on several alternative grounds.

SDOG filed opposition, primarily asserting its action was exempt from the anti-SLAPP statute under section 426.17, subdivision (b). SDOG also asserted its claims did not arise from Defendants' protected activity, but rather Defendants' unlawful self-dealing contracts.[10]

On the merits, relying on *Hub City Solid Waste Services, Inc. v. City of Compton* (2010) 186 Cal.App.4th 1114 (*Hub City*), SDOG asserted there was a triable issue whether Hearn "exerted a level of influence in a capacity that demands the public

---

[10]   At the hearing, SDOG's attorney made the same point, asserting, "The gravamen of this case in the complaint is we're claiming gift of public funds, breach of California statute, violation of the conflict of interest law [Government Code section] 1090. That's the gravamen. It has nothing to do whatsoever with their news gathering. That's the issue here."

trust . . . ."  Addressing the trademark claim, SDOG asserted Defendants had not demonstrated SDSU received compensation from, or authorized, inewsource to use the SDSU trademark.  SDOG supported its opposition with two declarations from its attorney, John McClendon.  Those declarations contain no factual assertions other than an attempt to authenticate SDOG's verified complaint, the CSU Handbook on Contracts and Procurement, CSU's website section on CSU auxiliary organizations, a deposition transcript in *San Diegans for Open Government v. City of San Diego* (Super. Ct. San Diego County, 2012, No. 37-2012-00088065), restated articles of incorporation for SDOG, and a statement attributed to Hearn in an Internet article about this case.

In reply, Defendants asserted SDOG failed to offer any admissible evidence to support its claims.  At the hearing, inewsource's attorney made the same point, stating:

"[T]he evidence is undisputed from all the defendants and all the people involved in these transactions, Ms. Hearn had no position, power, decision-making ability or influence on the KPBS side of the coin.  In fact, I think it really borders on the ridiculous that a part-time professor of a . . . three-hour class, up against huge corporations that have sophisticated boards of directors, officers and attorneys have any real influence in this decision as a matter of law.  The record is clear, there's no evidence of any influence or power-making decision because none exists.  She negotiates on behalf of inewsource[,] and the university[] and KPBS had their team of people that negotiated for KPBS."

After taking the matter under submission, the court granted the anti-SLAPP motions.  The court determined SDOG's claims were "based upon contracts to investigate and report on the news" within the meaning of section 425.17, subdivision (d).  The court also determined the action "arises from protected activity" because "the contracts at issue are inextricably related to news gathering and dissemination."  Stating SDOG was

16

required to submit admissible evidence to establish it can prevail, the court ruled, "Plaintiff did not meet its burden of showing by competent and admissible evidence that it has a probability of prevailing on the merits of its claim."

DISCUSSION

I.  <em>THE COURT PROPERLY GRANTED THE ANTI-SLAPP MOTIONS</em>

A.  *General Anti-SLAPP Principles*

Section 425.16 provides in part, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)

"'The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance and prevent meritless litigation designed to chill the exercise of First Amendment rights.  [Citation.]  The Legislature has declared that the statute must be "construed broadly" to that end.'"  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 268; (§ 425.16, subd. (a).)  "The point of the anti-SLAPP statute is that you have a right *not* to be dragged through the courts because you exercised your constitutional rights."  (*People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1317.)

1.  *Threshold issue—is there an applicable exemption?*

A threshold consideration in evaluating an anti-SLAPP motion is whether the plaintiff's lawsuit is exempt from the anti-SLAPP statute.  (*Navarro v. IHOP Properties,*

17

*Inc.* (2005) 134 Cal.App.4th 834, 840; *Save Westwood Village v. Luskin* (2014) 233 Cal.App.4th 135, 143.) Relevant here, section 425.17, subdivision (b) provides the anti-SLAPP statute does not apply to "any action brought solely in the public interest" if (1) "[t]he plaintiff does not seek any relief greater than or different from the relief sought for the general public"; (2) the action, if successful, would "enforce an important right affecting the public interest, and would confer a significant benefit, whether pecuniary or nonpecuniary, on the general public"; and (3) "[p]rivate enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter."

Section 425.17, subdivision (b) thus provides a "safe harbor" for a plaintiff from having to satisfy the anti-SLAPP statute. (See *Holbrook v. City of Santa Monica* (2006) 144 Cal.App.4th 1242, 1249.) As an exception to the anti-SLAPP statute, it is to be "narrowly interpreted." (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 319.)

Although section 425.17, subdivision (b) provides that certain public interest lawsuits are exempt from the anti-SLAPP statute, subdivisions (d)(1) and (d)(2) of that statute provide exceptions to that exemption for the news media "when the underlying act relates to news gathering and reporting to the public . . . ." (*Major, supra,* 134 Cal.App.4th at p. 1496.) Thus, regardless of whether the plaintiff's action is a public interest lawsuit under section 425.17, subdivision (b), if section 425.17, subdivision (d) also applies, the defendant may bring an anti-SLAPP motion.

2. *Protected activity*

If the court determines the action is not exempt from the anti-SLAPP statute, it must then address whether the complaint should be stricken under section 425.16. Resolving that issue involves two steps. "First, the defendant must establish that the challenged claim arises from activity protected by section 425.16." (*Baral, supra,* 1 Cal.5th at p. 384.) The defendant meets this burden by showing the act underlying the plaintiff's cause of action fits one of the categories of protected speech enumerated in section 425.16, subdivision (e). (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

Section 425.16, subdivision (e) sets forth four categories of protected activity. Relevant here, section 425.16, subdivision (e) defines protected activity to include "any . . . conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." This category "extends the protection of the anti-SLAPP statute beyond actual instances of free speech to 'all conduct in furtherance of the exercise of the right of free speech in connection with a public issue.'" (*Collier v. Harris* (2015) 240 Cal.App.4th 41, 51 (*Collier*), italics omitted.)

In determining whether a cause of action arises from protected activity, the court disregards the label of the claim and instead examines the principal thrust or gravamen of the plaintiff's cause of action. The court does this "'"by identifying '[t]he allegedly wrongful and injury-producing . . . conduct that provides the foundation for the claim.'"'" (*Hunter*, *supra*, 221 Cal.App.4th at p. 1520.) "In the anti-SLAPP context, the critical

19

consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navellier, supra,* 29 Cal.4th at p. 89.) In making this determination, the court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability . . . is based." (§ 425.16, subd. (b)(2).)

The anti-SLAPP statute's focus is not the form of the plaintiff's action, but rather the defendant's activity that gives rise to his or her asserted liability, and whether that activity constitutes protected speech. (*Navellier, supra,* 29 Cal.4th at p. 92.) "Nothing in the statute . . . categorically excludes any particular type of action from its operation." (*Ibid.*)

Courts must be careful to distinguish allegations of conduct on which liability is based from allegations of motives for such conduct. The court reviews the parties' pleadings, declarations, and other supporting documents to determine what conduct is actually being challenged, not to determine whether the conduct is actionable. (*Hunter, supra,* 221 Cal.App.4th at p. 1520.)

3. *Prima facie case established by admissible evidence*

"If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral, supra,* 1 Cal.5th at p. 384.) The California Supreme Court has characterized this step as a "'summary-judgment-like procedure.'" (*Ibid.*) In analyzing whether the plaintiff has demonstrated a probability of prevailing on the merits, the court measures the plaintiff's showing against a standard similar to that used in deciding a motion for nonsuit, directed verdict, or summary judgment. The court determines only whether the plaintiff has made

20

a prima facie showing of facts that would support a judgment if proved at trial. The court does not weigh the plaintiff's evidence. However, the plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence. (*Oviedo v. Windsor Twelve Properties, LLC* (2012) 212 Cal.App.4th 97, 109 (*Oviedo*); *Brodeur, supra,* 248 Cal.App.4th at p. 679.)

It is important to note the anti-SLAPP statute does not immunize or insulate Defendants from *any* liability for claims arising from protected activity. It only provides a procedure for weeding out, at an early stage, such claims that are meritless. (*Baral, supra,* 1 Cal.5th at p. 384; *Navellier, supra,* 29 Cal.4th at p. 89.)

B. *The Standard of Review*

We review an order granting or denying an anti-SLAPP motion de novo. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

C. *The Media Exception to the Public Interest Exemption Applies Here*

1. *The parties' contentions*

The threshold issue in this case is whether SDOG's complaint is exempt from the anti-SLAPP statute as a public interest lawsuit under section 425.17, subdivision (b).

SDOG asserts this exemption applies because (1) SDOG does not seek any direct relief greater than or different from the relief sought by the general public, such as individual money damages; (2) the action enforces an important public right prohibiting self-dealing; (3) private enforcement is necessary, with SDOG bearing a disproportionate burden because it has no possibility of recovering money in this case. Indeed, anticipating Defendants would bring anti-SLAPP motions, SDOG's complaint alleges,

21

"No matter how any portion of this pleading's allegations or prayer is construed, in no way does [SDOG] intend to assert a claim or seek relief that is inconsistent with" the public interest exemption in section 425.17, subdivision (b).[11]

Inewsource contends the public interest exemption in section 425.17, subdivision (b) does not apply, asserting, "[I]t is clear this lawsuit is not brought in the public interest, but rather to silence inewsource negative coverage of Briggs." Inewsource contends "substantial evidence establishes" SDOG is the "alter ego" of Briggs and his law firm. The University defendants make the same arguments, asserting, "[T]here is strong evidence that this lawsuit was brought to silence inewsource from publishing unflattering stores about attorney Cory Briggs."

The University defendants also contend that in determining whether SDOG's complaint is encompassed within section 425.17, subdivision (b), we should consider evidence on the merits, including declarations stating Hearn did not hold a decisionmaking position at SDSU or with KPBS. The University defendants contend that if such evidence "defeats" the plaintiff's mere allegations in its complaint, "the court should find that the plaintiff has not met its burden" to establish the public interest lawsuit exemption to the anti-SLAPP statute applies.

The University defendants acknowledge that in *Tourgeman v. Nelson Kennard* (2014) 222 Cal.App.4th 1447, 1466 (*Tourgeman*), this court rejected a similar argument.

---

11    We have no occasion in this case to consider or decide whether such an allegation is effective to bring a lawsuit within the public interest exemption in section 425.17, subdivision (b), and we express no opinion on that issue.

22

There, we held the applicability of the public interest exemption is determined by examining the allegations of the complaint alone. More recently, in *San Diegans for Open Government v. Har Construction, Inc.* (2015) 240 Cal.App.4th 611, 628 (*Har Construction*), this court approvingly cited *Tourgeman* for the same rule, stating whether the public interest exemption in section 425.17, subdivision (b) applies is based on the plaintiff's allegations and "does not require the plaintiff to proffer affirmative evidence." Although the University defendants do not mention it, other courts have agreed with *Tourgeman* on this point. (*Cruz v. City of Culver City* (2016) 2 Cal.App.5th 239, 249; *The Inland Oversight Committee v. County of San Bernardino* (2015) 239 Cal.App.4th 671, 677.) Nevertheless, the University defendants ask us to overrule or distinguish this holding in *Tourgeman*.

In the reply brief, SDOG asserts "there is absolutely no merit to [Defendants'] self-serving lie that [its] action was brought to retaliate against [inewsource] for writing stories about Mr. Briggs." SDOG states it would "never retaliate against the media for criticisms leveled against [itself] or its attorneys." SDOG denies it is Briggs's alter ego, stating there is "no evidence" to support it. SDOG also contends *Tourgeman, supra,* 222 Cal.App.4th 1447 was correctly decided and should be followed.

### 2. *Issues unnecessary for decision*

To resolve this appeal, it is unnecessary for us to consider many of the issues raised by the parties' contentions. If the media-defendant exception (§ 425.17, subd. (d)(1)) to the public interest exemption (§ 425.17, subd. (b)) applies, we need not

23

determine whether SDOG's action is a public interest lawsuit under section 425.17, subdivision (b) because, even if it were, defendants may still invoke the anti-SLAPP law. (*Stutzman v. Armstrong* (E.D.Cal. Sept. 10, 2013), No. 2:13-CV-00116-MCE-KJN) 2013 U.S.Dist. Lexis 129204 at *39.)

Thus, we turn to section 425.17, subdivision (d) to determine if SDOG's action is exempt from the anti-SLAPP statute. As explained *post*, section 425.17, subdivision (d)(1) applies in this case and, therefore, we need not consider or decide whether (1) SDOG is Briggs's alter ego, (2) SDOG brought this lawsuit to retaliate, (3) *Tourgeman* should be distinguished or overruled, and (4) any of the other issues the parties raise about the applicability of the public interest exemption under section 425.17, subdivision (b).[12]

3. *Analysis of the media-defendant exception in section 425.17, subdivision (d)*

Under section 425.17, subdivision (d)(1), the exemption to the anti-SLAPP statute in subdivision (b) of that statute does not apply to the following:

"Any person enumerated in subdivision (b) of Section 2 of Article I of the California Constitution or Section 1070 of the Evidence Code, or any person engaged in the dissemination of ideas or expression in any book or academic journal, while engaged in the gathering, receiving, or processing of information for communication to the public.

---

[12]   Accordingly, we deny the request for judicial notice filed by inewsource on May 13, 2016, requesting judicial notice of an e-mail purportedly sent from Briggs to Hearn, which inewsource asserted was relevant to show retaliation. Whether SDOG's action was brought to retaliate is not relevant to any outcome determinative issue on appeal. (*Scruby, supra,* 37 Cal.App.4th at p. 701, fn.1.)

24

Persons "enumerated" in the cited portion of the California Constitution and Evidence Code are a "publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication, or by a press association or wire service, or any person who has been so connected or employed" as well as a "radio or television news reporter or other person connected with or employed by a radio or television station, or any person who has been so connected or employed." (Cal. Const., art. I, § 2, subd. (b).)[13]

Section 425.17, subdivision (d)(1) was intended to "'exempt the news media and other media defendants . . . from [section 425.17, subdivision (b)] when the underlying act relates to news gathering and reporting to the public with respect to the news media or to activities involving the creation or dissemination of any work of a motion picture or television studio.'" (*Major, supra,* 134 Cal.App.4th at pp. 1496-1497.)  In section 425.17, subdivision (d), "the Legislature checked the reach of the 'public interest'" exemption by preserving the application of the anti-SLAPP law to actions that implicate important forms of protected speech. (*Major,* at p. 1497.)

The trial court determined section 425.17, subdivision (d) applies in this case to subject SDOG's action to the anti-SLAPP statute.  We agree.  The Defendants, news media entities and Hearn, are persons enumerated in section 425.17, subdivision (d)(1). SDOG does not contend otherwise.  Rather, SDOG asserts section 425.17, subdivision (d)(1) is inapplicable because Hearn's alleged "illegal conduct did not occur '*while she*

---

13    Evidence Code section 1070, subdivisions (a) and (b) contain the same list of persons.

25

*was engaged in*' gathering, writing, or reporting the news" as provided in the last clause of section 425.17, subdivision (d)(1).

The issue presented by SDOG's argument is whether the phrase "engaged in the gathering, receiving, or processing of information for communication to the public" in section 425.17, subdivision (d)(1) includes noncommunicative conduct—i.e., the negotiation and execution of the 2012 Agreement and 2015 lease—done in furtherance of the news media's exercise of its free speech right to gather, receive, or process information for communication to the public.

"'Our role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.] Because the statutory language is generally the most reliable indicator of that intent, we look first at the words themselves, giving them their usual and ordinary meaning. [Citation.] We do not, however, consider the statutory language in isolation, but rather examine the entire substance of the statute in order to determine the scope and purpose of the provision, construing its words in context and harmonizing its various parts." (*People v. Castillolopez* (2016) 63 Cal.4th 322, 329.)

"Engaged in" means "to begin and carry on an enterprise or activity." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 413.) The contracts SDOG challenges dictate the process under which inewsource and KPBS jointly were to begin and carry on newsgathering and reporting. For example, the 2012 Agreement requires inewsource to deliver to KPBS 10 "substantial data driven stories" and to make its reporters "available as reasonably requested" by KPBS "for broadcast coverage . . . ." Similarly, the 2015

26

lease provides KPBS is leasing space to inewsource "for the benefit of securing investigative news content for KPBS."

Therefore, SDOG's action here is encompassed within section 425.17, subdivision (d)(1) because it challenges "any person enumerated in subdivision (b) of Section 2 of Article I of the California Constitution . . . while engaged in the gathering, receiving, or processing of information or communication to the public."

This conclusion is not only compelled by the statute's text, but also finds additional support in the statute's legislative history. The analysis for the senate bill enacted as section 425.17 states:

"Proposed subdivision (d) of newly added Section 425.17 would exempt the news media and other media defendants (such as the motion picture industry) from the bill *when the underlying act relates to news gathering and reporting to the public with respect to the news media . . . .* For claims arising from these activities, the current SLAPP motion would remain available to these defendants." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended May 1, 2003, p. 14; *Ingels, supra,* 129 Cal.App.4th at pp. 1067-1068.) (Italics added.)

In the words of the senate bill analysis, the contracts SDOG challenges "relate[]" to news gathering and reporting. Indeed, news gathering and reporting is the fundamental essence of both contracts. For example, under the 2012 Agreement, KPBS expressly agreed to provide inewsource with "news gathering equipment" and in exchange, inewsource agreed to provide, among other news reports, one "Watchdog feature per month" and a "[w]eekly data brief on a topic of interest to KPBS'[s] audience." Similarly, under the 2015 lease, KPBS leased space to inewsource "for the benefit of securing investigative news content for KPBS."

27

Nevertheless, SDOG asserts section 425.17, subdivision (d)(1) does not apply because it is suing Hearn not for actually engaging in newsgathering, but instead for allegedly using her influence as an SDSU employee to negotiate a contract favorable for inewsource "*before* any news-related function began." This argument fails, however, because it incorrectly analyzes the applicability of section 425.17, subdivision (d)(1) by focusing on Hearn's allegedly improper motive. Section 425.17, subdivision (d)(1) is not concerned with motive. There is nothing in the statute that conditions its application on good or bad motive, or any motive at all. Rather, the statute is intended to protect news media engaged in newsgathering and reporting, conduct SDOG's lawsuit challenges by its attack on the inewsource-KPBS contracts.

In the reply brief, SDOG asserts that even if section 425.17, subdivision (d)(1) otherwise would apply, we should "reject its application because it exempts the press from being subject to laws of general applicability: the state's conflict-of-interest laws and prohibitions against the waste of public resources." In a related argument, SDOG asserts, "to hold that the anti-SLAPP statute renders a public employee untouchable under conflict-of-interest laws just because she is also a member of the press" violates "equal protection of the laws . . . ." SDOG contends Defendants' interpretation of section 425.17, subdivision (d) gives them "immunity to violate" conflict of interest laws while subjecting nonmedia public employees to those same laws.

We reject these SDOG arguments because they betray a fundamental misunderstanding of the anti-SLAPP statute. Determining the anti-SLAPP statute applies to a particular claim does not in any way exempt the defendant from being subject to laws

28

of general applicability. The anti-SLAPP statute requires that in cases where the statute applies, the plaintiff is required to make a prima facie showing the claims alleged have minimal merit. If SDOG actually had evidence to support a prima facie against defendants here, rather than just bare allegations in its complaint, the court would have been required to have denied the motions to strike. The anti-SLAPP statute "poses no obstacle to suits that possess minimal merit." (*Navellier, supra,* 29 Cal.4th at p. 93.) Contrary to SDOG's assertions, determining section 425.17, subdivision (d)(1) applies does not grant defendants any immunity whatsoever. (*Navellier, supra,* 29 Cal.4th at p. 93.) It simply means that SDOG is required to present admissible evidence to support its allegations, or have its case dismissed.

Because section 425.17, subdivision (d)(1) excepts SDOG's lawsuit from the exemption to the anti-SLAPP statute provided in subdivision (b) of the same statute, defendants were entitled to bring their anti-SLAPP motions. Accordingly, we now consider whether the trial court correctly determined (1) the action is one arising from protected activity under section 425.16; and (2) SDOG failed to sustain its burden of establishing a prima facie case through admissible evidence.14

D. *Protected Activity*

In this step of the anti-SLAPP analysis, we determine whether SDOG's causes of action arise from the defendant's acts "in furtherance of the person's right of . . . free

---

14      The parties also dispute whether SDOG's action is governed by section 425.17, subdivision (d)(2). However, having determined SDOG's action is within the ambit of section 425.17, subdivision (d)(1), we need not determine whether it also falls within subdivision (d)(2).

speech . . . in connection with a public issue." (§ 425.16, subd. (b)(1).) Section 425.16, subdivision (e) sets forth four categories of protected activity. Relevant here, subdivision (e)(4) of that statute defines protected activity to include not only speech itself, but also "any other conduct in furtherance of the exercise" of the constitutional right of free speech "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).) This category is a "'catch-all'" that extends the anti-SLAPP statutes beyond actual instances of free speech to "'all conduct in furtherance of the exercise of the right of free speech in connection with a public issue.'" (*Collier, supra,* 240 Cal.App.4th at p. 51, italics omitted.) An act is in furtherance of the rights of free speech "'"if the act helps to advance that right or assists in the exercise of that right."'" (*Ibid.*)

There is a protected free speech right to report the news. (*Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166 (*Lieberman*).) Reporting the news and creating a television show both qualify as an exercise of free speech. (*Hunter, supra,* 221 Cal.App.4th at p. 1521.) Reporting the news requires the assistance of newsgathering and other related conduct and activity, which are acts undertaken in furtherance of the news media's right to free speech. Such conduct is therefore is protected conduct under the anti-SLAPP statute. (*Lieberman, supra,* 110 Cal.App.4th at p. 166.)

Moreover,"'[a]n act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right.'" (*Hunter, supra,* 221 Cal.App.4th at p. 1521, quoting *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*).) Accordingly, prepublication or preproduction acts such as investigating, newsgathering, and conducting interviews constitute conduct that

30

furthers the right of free speech and is protected activity. (*Hunter, supra,* 221 Cal.App.4th at p. 1521.)

For example, in *Hunter, supra,* 221 Cal.App.4th 1510, the appellate court found the plaintiff's age and gender discrimination claims against a television station were based on protected activity because the station's decision to hire younger and less qualified persons as weather anchors were acts in furtherance of the station's free speech rights. (*Id.* at p. 1521.) The news station's casting decision "helped advance or assist" first amendment expression, and therefore was a form of protected activity. (*Ibid.*; *Tamkin, supra,* 193 Cal.App.4th at p. 143 [writer's use of plaintiffs' names in draft script of television show is protected activity because it helped to advance or assist in creating, casting, and broadcasting a television show]; *Lieberman, supra,* 110 Cal.App.4th at p. 164 [allegedly unlawful newsgathering technique was protected activity because it aided in the reporting of news].)[15]

Here, the trial court correctly determined SDOG's lawsuit arises from defendants' protected activity. "'In assessing whether a cause of action arises from protected activity, "'we disregard the labeling of the claim [citation] and instead "examine the principal thrust or gravamen of the plaintiff's cause of action . . ." . . . We assess the principal thrust

---

[15] In a case none of the parties cite, *Wilson v. Cable News Network, Inc.* (2016) 6 Cal.App.5th 822, review granted March 1, 2017, S239686, in a 2-1 decision, the Second District, Division One disagreed with *Hunter, supra,* 221 Cal.App.4th 1510 in the context of a case alleging employment discrimination and retaliation. By virtue of the grant of review, *Wilson* has no precedential effect. (Cal. Rules of Court, rule 8.1115(e)(1).)

by identifying "[t]he allegedly wrongful and injury-producing conduct."'"'" (*Collier, supra,* 240 Cal.App.4th at p. 50.)

The allegations in SDOG's lawsuit make clear the injury-producing conduct underlying its claims consists of the contracts between inewsource and KPBS that govern the process in which these defendants jointly engage in newsgathering and reporting news to the public. For example, paragraph 5 of the complaint expressly states SDOG "challenges two contracts," namely, the 2012 Agreement and the 2015 lease (which SDOG refers to as the "2012 Agreement and the 2014 Lease." In the first cause of action, SDOG alleges the 2012 Agreement is "void" because, among other reasons, the University defendants did not receive "commensurate value" under the 2012 Agreement. In the second cause of action, SDOG alleges the subsequent lease "is void and otherwise illegal," for similar reasons. The third cause of action, where SDOG realleges and incorporates by reference all of the allegations involving the 2012 Agreement and 2015 lease is also based on that same contractual relationship among the defendants. In the fourth cause of action, SDOG again centers its allegations against the two contracts, asserting Hearn improperly "used her position as a lecturer" to secure approval of both contracts. Thus, SDOG's lawsuit targets conduct (the KPBS-inewsource contracts) that advances and assists the defendants in exercising their right to report the news, and therefore is protected activity under section 426.16, subdivision (e). (*Lieberman, supra,* 110 Cal.App.4th at p. 166.)

SDOG attempts to avoid the application of the anti-SLAPP statute by asserting the "acts the [c]omplaint is [*sic*] based on" are Defendants' negotiation and execution of

agreements violating statutory and constitutional prohibitions against self-dealing and gifts of public funds. SDOG states, "The offending action here is the procuring of a contract by unlawful influence, and not any free-speech or petitioning activity." SDOG asserts, "But for [Defendants'] contracting in violation [of law], this action would have never been brought." SDOG repeats the same argument in its reply brief, asserting, "The [c]omplaint is *based on* the following acts: the negotiation and execution of the [a]greements by [Defendants] in violation of [Government Code s]ections[] 1090 and 8314 and the California Constitution."

SDOG's argument fails because it ignores California case law, which holds that in determining whether the defendant's acts are protected activity, the underlying conduct must be separated from the defendant's purported unlawful motive. (*Hunter, supra,* 221 Cal.App.4th at p. 1520.) For example, in *Hunter*, plaintiff sued two Los Angeles television stations, alleging they had committed gender discrimination against him in their hiring of a weather anchor position for the news program. (*Id.* at p. 1514.) On appeal, the court held the anti-SLAPP statute applied to plaintiff's claims because the injury-producing conduct alleged in the complaint consisted of the defendant's decisions about whom to hire as the on-air weather anchor for its newscasts, an act in furtherance of the right to free speech. (*Hunter,* at p. 1523.) The plaintiff in *Hunter* asserted the anti-SLAPP statute did not apply because "the 'conduct' underlying his causes of action [was] not [the defendant's] selection of its weather anchors, but rather [the] decision to utilize discriminatory criteria in making those selections." (*Hunter,* at pp. 1521-1522.) The *Hunter* court rejected that argument because it "confuses the conduct underlying Hunter's

33

claim—CBS's employment decisions—with the purportedly unlawful motive underlying that conduct—employment discrimination." (*Id.* at p. 1522.) The *Hunter* court noted that the California Supreme Court in *Navellier, supra,* 29 Cal.4th at page 94 had "clarified that when assessing whether claims arise from protected activity, courts must distinguish between the acts underlying a plaintiff's causes of action and the '"claimed illegitimacy of [those] acts[, which] is an issue . . . the plaintiff must raise and support in the context of [demonstrating] . . . a prima facie showing of the merits . . . ."'" (*Hunter, supra,* 221 Cal.App.4th at p. 1522.)

Applying *Hunter, supra,* 221 Cal.App.4th 1510 here, when determining whether SDOG's action arises from the Defendants' protected acts, we must separate the alleged unlawful motive (self-dealing) from the Defendants' conduct (entering into news gathering and news producing contracts). In *Hunter,* the court held the plaintiff's claims were based on the defendant's decisions regarding its choice of a weather anchor, which were acts in furtherance of its First Amendment rights, and not based on discrimination, which was the alleged motive for the conduct. (*Hunter, supra,* 221 Cal.App.4th at p. 1523.) Likewise here, for purposes of applying the anti-SLAPP law, SDOG's claims are based on Defendants' decisions in entering into contracts to partner news gathering, news reporting, and news production on television and other media—and not the alleged unlawful motive for such acts, self-dealing. Accordingly, SDOG's action is based on acts

in furtherance of Defendants' free speech rights, and therefore protected activity under the anti-SLAPP statute.[16] (§ 425.16, subd. (e).)

In a related argument, SDOG contends the anti-SLAPP statute does not apply because inewsource allegedly engaged in "illegal activity" in the subject contracts. In *Flatley v. Mauro* (2006) 39 Cal.4th 299, 317 (*Flatley*), the California Supreme Court held that speech or petitioning activities that are illegal as a matter of law are not protected by the anti-SLAPP statute.

SDOG's argument fails because conduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage simply because it is alleged to have been unlawful or unethical. (*Flatley, supra,* 39 Cal.4th at p. 317.) The asserted protected speech loses protection only if it is established through a defendant's concession or by uncontroverted and conclusive evidence that the conduct is illegal as a matter of law. (*Collier, supra,* 240 Cal.App.4th at p. 55.) The mere fact the plaintiff alleges the defendant engaged in unlawful conduct does not cause the conduct to lose its

---

[16]   SDOG contends *Hunter, supra,* 221 Cal.App.4th 1510 is distinguishable, asserting the protected conduct there was "not incidental, but is intrinsically tied to the delivery of media content" whereas here, the contracts SDOG challenges were simply "lease agreements, which are not likewise intrinsically tied to delivering the news, and only incidental to doing so." However, the record belies SDOG's argument. Under the 2012 Agreement KPBS agreed to provide not just office space, but also news gathering equipment, studios and production areas, and also agreed to invite inewsource reporters to its weekly and daily news meeting and planning groups. In consideration, inewsource agreed to provide news stories and make its reporters available to KPBS "for broadcast coverage" including feature stories and "other programs."

protection under the anti-SLAPP statute. (*Birkner v. Lam* (2007) 156 Cal.App.4th 275, 285.) Here, the Defendants have not admitted the alleged conduct was illegal, and SDOG presented no evidence to establish that it was illegal as a matter of law. Accordingly, the illegal activity exception to the anti-SLAPP statute does not apply.[17]

E. *Probable Merits Success*

Having determined the allegations against Defendants arose from protected speech, we next must determine whether SDOG demonstrated a probability of prevailing on its claims. (*Karnazes v. Ares* (2016) 244 Cal.App.4th 344, 354 (*Karnazes*).) To defeat the anti-SLAPP motion, SDOG was required to submit "competent and admissible evidence" establishing a prima facie case. (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236.)

Government Code section 1090 prohibits public officers from having a financial interest in any contract "made by them" in their official capacity. (*Har Construction, supra,* 240 Cal.App.4th at p. 616.) The Defendants submitted seven declarations from witnesses having personal knowledge of relevant facts. For example, Hearn declared she had "no role whatsoever—much less authority, decision-making power, or influence on the KPBS side of the negotiations." She was not "paid at all" by SDSU when the 2012

---

[17] Under section 425.16, subdivision (e), conduct in furtherance of the exercise of free speech rights is protected under the anti-SLAPP statute only where it is "in connection with a public issue or an issue of public interest." As inewsource notes, SDOG does not address the public interest prong of section 425.16, subdivision (e) in its opening brief discussion of whether its claims arise out of protected activity. Accordingly, the issue is abandoned. (*H.N. & Frances C. Berger Foundation v. City of Escondido* (2005) 127 Cal.App.4th 1, 15.)

Agreement was negotiated and signed. Hearn unequivocally stated the allegations of conflict of interest in SDOG's complaint were "false" as were SDOG's allegations she received personal benefits from the contracts. Hearn declared she has never been a university department head, advisory board member, committee member, officer, department chairperson, or a tenured or tenure-track professor. Wolfson declared Hearn has never worked for or been employed by SDSURF, nor has she been on its management team or its board of directors. He stated Hearn has never acted on behalf of SDSURF.

Citing *Hub City, supra,* 186 Cal.App.4th 1114, SDOG contends this evidence itself creates a triable issue that Defendants violated Government Code section 1090 because even a person in an "advisory position" may potentially exert influence over contracting decisions. We disagree because *Hub City* is factually distinguishable.

In *Hub City, supra,* 186 Cal.App.4th 1114, the City of Compton was awarded $22 million against defendant Aloyan. Aloyan had been an independent contractor with the city, in charge of its waste management. During his relationship with the city he negotiated a contract with the city to privately provide waste management services. Shortly after city council approval, he made campaign contributions to the city council members who voted to approve the contract. He additionally hired relatives of one of the council members. Aloyan was the director of the city's in-house waste division, working alongside city employees, overseeing day-to-day operations of Compton's waste management division, and taking responsibility for compliance with state-mandated recycling and waste reduction efforts. (*Id.* at pp. 1118-1120.) Moreover, Aloyan

37

supervised city staff, negotiated contracts, and purchased equipment and real estate on behalf of Compton. He was "intricately involved in the city's waste management decisions." (*Id.* at p. 1125.)

Unlike the facts in *Hub City, supra,* 186 Cal.App.4th 1114, here there was no admissible evidence showing Hearn hired public employees, acted as director of any public agency or department, or oversaw any public function. Unlike *Hub City,* there is no evidence in this record showing Hearn was involved in KPBS's decision to enter into the 2012 Agreement and 2015 lease, much less "intricately involved." (*Id.* at p. 1125.)

SDOG offered no admissible and competent evidence to support its allegations. The only evidence SDOG offered was two declarations of its own attorney, John McClendon. The first contains no factual assertions, other than an attempt to authenticate (1) SDOG's complaint, (2) the CSU Handbook on Contracts and Procurement, (3) CSU's website section on the history of CSU auxiliary organizations, (4) a deposition transcript in another case involving SDOG, and (5) the restated articles of incorporation of SDOG.

Defendants objected to McClendon's declaration on numerous grounds, including lack of personal knowledge, lack of foundation, and hearsay.

The day before the hearing, McClendon filed a "supplemental declaration" attempting to authenticate one additional document—what purported to be an inewsource article in which Hearn characterized SDOG's action as involving an "office lease." McClendon asserted Hearn had thus "conced[ed]" SDOG's action was unrelated to media news gathering under section 425.17, subdivision (d).

38

McClendon's declarations do not establish a triable issue of fact on any material issue within the scope of SDOG's complaint. His declarations do not establish a foundation based on personal knowledge for authenticating any of the documents attached, other than the complaint itself. (*Tuchsher, supra,* 106 Cal.App.4th at p. 1236; Evid. Code, § 702, subd. (a).)[18] His declarations fail to establish a foundation for any exception to the hearsay rule. Even the complaint, albeit verified, avails SDOG nothing on this issue. (*Brodeur, supra,* 248 Cal.App.4th at p. 679.)[19] This is because an assessment of the probability of prevailing looks to trial, and the evidence that would be admissible to create triable factual issues at that time. (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497.)

Because SDOG failed to offer any admissible evidence to establish a prima facie case on any of its claims, the court correctly granted the anti-SLAPP motions. (See *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1403 [anti-SLAPP granted where plaintiff "failed to submit any admissible evidence" that defendant did anything wrong];

---

18     Evidence Code section 702, subdivision (a) provides in part: "[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter."

19     *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1289-1290 states to the contrary. However, the First District's holding in *Salma* has not been followed by any other published decision, and every other published case on this issue holds that the allegations of even a verified complaint cannot establish probability of success on the merits under the anti-SLAPP statute. (See, e.g., *Brodeur, supra,* 248 Cal.App.4th at p. 679; *Oviedo, supra,* 212 Cal.App.4th at p. 109; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672-673.) For these reasons and those stated in the text, we disagree with *Salma*'s holding on this point.

39

*Karnazes, supra,* 244 Cal.App.4th at pp. 354-355 [anti-SLAPP granted where plaintiff failed to offer any evidence and relied solely on her own complaint].)  Having determined SDOG failed to sustain its burden of establishing a prima facie case, it is unnecessary to consider any other reasons defendants assert for affirming the order.[20]

DISPOSITION

The order granting the anti-SLAPP motions is affirmed.  Defendants and real parties in interest are entitled to costs incurred on appeal.

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DATO, J.

---

[20]    For example, inewsource contends SDOG lacks standing to assert certain claims. For this reason, we deny SDOG's request for judicial notice filed February 23, 2016, requesting this court to take judicial notice on the issue of standing.