Filed 1/3/23; Modified and Certified for Pub. 1/26/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JONATHAN STARR, | |
| Plaintiff and Respondent, | G060597 |
| v. | (Super. Ct. No. 30-2019-01117553) |
| M. THOMAS ASHBROOK, as Trustee, etc. | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Kim R. Hubbard, Judge. Affirmed. Request for Judicial Notice. Granted. Motion to Augment Record. Granted.

Conti Law and Alexander L. Conti for Defendant and Appellant.

Buchalter, Robert Collings Little and Gordon C. Stuart for Plaintiff and Respondent.

\*        \*        \*

INTRODUCTION

Jonathan Starr brought a probate petition challenging the actions of M. Thomas Ashbrook, who was acting as the trustee of the revocable trust of Jonathan's father, Arnold Starr. The surcharge cause of action of the petition alleged that Ashbrook had wasted and misused trust assets by pursuing a meritless petition for instructions and using trust assets to fund litigation against Jonathan Starr and his brothers. Ashbrook responded by bringing a special motion to strike the surcharge cause of action pursuant to California's anti-SLAPP statute. (Code Civ. Proc., § 425.16.)[1]

The trial court concluded the allegations of the surcharge cause of action did not arise out of activity protected by section 425.16 and denied Ashbrook's anti-SLAPP motion. Ashbrook appeals from the order denying his anti-SLAPP motion.

The core issue presented by this appeal is whether the surcharge cause of action arose out of allegations of waste and misuse of trust assets, which are not activities protected under section 425.16(b)(1), or from allegations of pursuing and funding litigation, which are constitutionally protected activities. We conclude, as did the trial court, the surcharge cause of action arose from the alleged waste and misuse of trust assets; that is, the alleged waste and misuse of trust assets was the injury-producing activity allegedly giving rise to Ashbrook's liability for breach of trust. Because we conclude the surcharge cause of action did not arise out of allegations of protected activity — the first step of the anti-SLAPP analysis — we affirm the order denying Ashbrook's anti-SLAPP motion without addressing the second step of that analysis.

---

[1] SLAPP is an acronym for "strategic lawsuit against public participation." (*Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2018) 4 Cal.5th 637, 639.) All code references are to the Code of Civil Procedure, unless otherwise stated. We refer to section 425.16, subdivision (b)(1) as section 425.16(b)(1) and section 425.16, subdivision (e) as section 425.16(e). We refer to the special motion to strike authorized by section 425.16(b)(1) as an anti-SLAPP motion.

As an initial matter, we address Ashbrook's argument that Jonathan lacked standing to bring the petition because the trust was revocable. We conclude Jonathan had and has standing to challenge Ashbrook's actions.

FACTS AND PROCEDURAL HISTORY

As we are deciding the appeal under the first step of the anti-SLAPP analysis, we derive the facts primarily from the allegations of Jonathan's petition and refer to declarations and other evidence presented only to determine what conduct is being challenged. (*Joslin v. Third Laguna Hills Mutual* (2020) 49 Cal.App.5th 366, 371; *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1389-1390.)

I. THE PARTIES AND THE TRUST

Arnold Starr, a retired neurology professor, is 90 years old and resides in Laguna Beach, California. He has two adult sons—Jonathan Starr and David Starr—by his first wife and one adult son—Noah Starr—by his second wife (Bonnie Olsen).[2] In 2016, Arnold and Olsen entered into a judgment of dissolution whereby they remained married but divided their assets and interests. Beginning in 2010, Arnold's cognitive functions began to decline and over the next several years his ability to reason and exercise judgment faded.

In March 1996, Arnold, as settlor, created the Arnold Starr Revocable Trust (the Trust) and executed the Trust instrument. The Trust was created as a revocable inter vivos trust with three primary assets: (1) Arnold's home in Laguna Beach, (2) a farm in Julian, California (the Julian Farm) and (3) a brokerage account with Morgan Stanley. The Julian Farm consists of a residence and an apple orchard.

Ashbrook is Arnold's neighbor and friend. They met during the summer of 2015 and share a love of painting.

---

[2] To be concise and avoid confusion, we henceforth refer to Arnold Starr and his three sons by first name. We intend no disrespect.

3

In 2012, Arnold began a romantic relationship with Sandie Steele, a former student. Steele was married to Kevin Steele but resided at least some of the time at Arnold's Laguna Beach home.

## II. THE AMENDED TRUST

Several events occurred in 2017 and 2018 that caused Jonathan to believe Arnold should make changes to his estate plan in order to protect himself from Steele. Among those events was the discovery that Steele verbally abused Arnold and had filed a lawsuit against him for injuries arising out of an automobile collision. Arnold was not aware of the lawsuit, and the attorney defending him did not believe Arnold had capacity to represent his own interests.

Jonathan arranged to have Arnold meet with his estate planning attorney, Daniel B. Rosen, to amend Arnold's estate plan. Arnold met with Rosen, sometimes with Jonathan present, about 12 times between September 2017 and April 2018. As a result of these meetings, Arnold amended the Trust to make Jonathan the acting trustee and David and Noah the successor trustees and amended his will to make Jonathan the executor and David and Noah the successor executors. The amended trust named Rosen as the trust protector with the power to remove trustees and appoint successor trustees.[3]

Arnold authorized Jonathan, David and Noah to assist with his legal, financial, and medical affairs. Arnold executed a power of attorney making Jonathan his acting agent and a springing advanced health care directive appointing Jonathan to make health care decisions if Arnold were deemed to lack capacity. In May 2018, Arnold, Jonathan, David, and Noah made Jonathan the authorized person on the Trust's bank accounts in order to prevent Steele from making withdrawals from them.

---

[3] The trust protector was also given the power to settle disputes and differences of opinion between trustees, resolve disputes and conflicts among beneficiaries, and review distributions made by the trustee.

4

### III. THE NOVEMBER 2018 AMENDMENT TO THE TRUST

Sometime during the summer of 2018, Steele discovered that Arnold had made changes to his estate plan that had placed Jonathan, David, and Noah in positions of authority. Steele told Ashbrook that Arnold's sons had "wronged Arnold in connection to [his] estate plan and finances." Steele contacted Arnold's nephew, Eric Klein, and told him that Jonathan had committed legal and financial crimes against Arnold and told Arnold's oldest and closest friend, Hillel Pratt, that Jonathan, David, and Noah had committed "crimes" against Arnold.

In July 2018, Arnold terminated Rosen's representation and hired new counsel, Stephanie Kitzes, to represent him in estate planning matters. Rosen resigned as trust protector.

A series of strange e-mail messages and telephone calls followed. On August 31, 2018, Jonathan received an e-mail from Arnold in which he said he did not want to "'displace'" Steele as his caregiver. In September 2018, Arnold called Jonathan and told him to "'stop suing him.'" Jonathan was not suing Arnold and told him so. Ashbrook knew that Arnold believed his sons were suing him but did not attempt to correct this false belief. Later in September, Noah received a text message in which Arnold told him he was retaining a new estate planning attorney, Alice B. Marshall.

In November 2018, Arnold, under Marshall's representation, made a complete amendment to the Trust (the November 2018 Amendment). Arnold removed Jonathan as trustee and David and Noah as successor trustees and appointed Klein as first successor trustee, followed by Comerica Bank. Ashbrook was named as trust protector. Arnold executed a new power of attorney replacing Jonathan with Klein as Arnold's first designated attorney-in-fact. Jonathan contends these changes were made because Steele had misrepresented to Marshall that Jonathan had committed "legal and financial crimes against Arnold."

5

## IV. ASHBROOK BECOMES TRUSTEE

By 2018, Jonathan, David, and Noah had become concerned over Arnold's diminishing capacity and reliance on Steele. In November 2018, Arnold underwent a capacity examination conducted by clinical psychologist Dr. Angela Eastvold. She determined that Arnold lacked capacity. At about the same time, Steele, Klein, and Marshall engaged in discussions regarding Arnold's intent to donate the Julian Farm to the University of California Irvine (UC Irvine). Klein believed that Steele was the driving force behind making this proposed gift and that Arnold was not aware of what was going on. In early 2019, Klein sent a letter to UC Irvine to express his grave concerns over Arnold's capacity and lack of awareness of having made a gift to UC Irvine.

Ashbrook discovered Klein had contacted UC Irvine and confronted him about it. Ashbrook told Klein he had acted beyond the scope of his duties as the successor trustee and could be removed. Ashbrook instructed Klein to withdraw the letter to UC Irvine. Klein resigned as successor trustee.

Under the terms of the November 2018 Amendment, Comerica Bank should have become the first successor trustee. Instead, Ashbrook, as trust protector, appointed his wife, Kerry Bowers as his successor trust protector and resigned as trust protector. Ashbrook then had Bowers remove the successor trustees and appoint Ashbrook as acting trustee of the Trust. The November 2018 Trust expressly stated that it was Arnold's "specific intent that the Trust Protector not be deemed a Trustee or fiduciary with respect to any trust hereunder."

In April 2019, Arnold retained a new estate planning attorney, Mark Powell, and in July 2019 replaced Powell with Nigel Burns. Ashbrook retained Powell to represent him in his capacity as trust protector. In July 2019, Burns sent Jonathan's counsel a letter warning Jonathan and his brothers immediately "refrain from making any

hurtful, malicious, or harassing comments regarding Ms. Sandi[e] Steele or [Arnold's] neighbors."

## V.  ARNOLD'S ISOLATION FROM HIS SONS

Steele monitored Arnold's e-mail, home telephone and cell phone, and cut off Arnold's access to family, friends, and representatives.  David was cut off from contact with Arnold in early 2018 after David had confronted Steele about her criticism of Olsen.  Jonathan was cut off from contact with Arnold in the middle of 2018 after Steele discovered the 2018 estate plan changes.  Noah, though cut off from contact with Arnold in the middle of 2019 did retain telephone access to Arnold.  Steele was present and monitored Arnold during his telephone conversations with Noah.

Throughout the summer of 2019, Jonathan's attorney communicated with Powell, and then Burns, in an attempt to informally establish contact between Arnold and his sons.  Neither Powell nor Burns would facilitate a meeting.  In September 2019, Burns set down rules for communicating with Arnold.

In early July 2019, Jonathan received an e-mail from Arnold's e-mail address asking Jonathan, David, and Noah to "remove me from your lawsuits."  None of Arnold's sons had ever filed a lawsuit against Arnold.  Noah called Arnold and explained that neither he nor his brothers were suing him.  Ashbrook did not explain to Arnold that his sons were not suing him even though Ashbrook knew that to be the case.

In June 2019, Noah received a text message from Ashbrook stating that if Noah wanted to see his father, he would have to agree to ground rules and Ashbrook would monitor any visits.  In July 2019, Noah visited Arnold at home.  During the visit, Ashbrook said he did not want to get to know Noah and stated, in Arnold's presence, that Jonathan had forced Arnold to change the Trust.  In November 2019, Arnold told Jonathan he wished to spend Thanksgiving Day with Jonathan and Arnold's grandchildren.  When Jonathan arrived at Arnold's home, Ashbrook forced him to leave.

7

In September 2019, Arnold's longtime financial advisor at Morgan Stanley told Arnold that he would no longer make trades at Arnold's direction because he displayed signs that he no longer was able to manage his legal and financial affairs. In late 2019, Arnold moved his account from Morgan Stanley.

## VI. ASHBROOK'S PETITION FOR INSTRUCTIONS

In September 2019, three documents relating to the Trust were executed: (1) an appointment of successor trust protector and resignation of acting trust protector, (2) removal and appointment of successor trustee, and (3) resignation by acting trustee and acceptance by designated successor trustee. The effect of those documents was that Arnold resigned as trustee of the Trust, Ashbrook became the sole trustee of the Trust, and Bowers became the trust protector. Jonathan alleges Arnold lacked capacity to make such decisions when he resigned as trustee.

On December 11, 2019, Ashbrook filed a petition for instructions (the Petition for Instructions) asking the probate court to adjudicate that a note purportedly handwritten by Arnold on November 6, 2019, was a valid amendment to the Trust. Based on the handwritten note, the Petition for Instructions sought to modify the Trust so that on Arnold's death Steele would receive $200,000 and the right to live in Arnold's Laguna Beach home rent-free for two years, and $2 million in cash and assets would be distributed to UC Irvine to endow a chair in honor of Arnold in the School of Medicine's Department of Neurology. Submitted with the Petition for Instructions was a consent and waiver form, signed by Arnold, by which he consented to the petition and waived notice of its hearing.

Jonathan alleges Arnold's signature on the consent and waiver form is a forgery. Jonathan, David, Noah, Olsen, and Klein all reviewed the signature and agreed it is not genuine. In April 2020, Jonathan's counsel sent a letter to Ashbrook's counsel to formally object to the use of Trust funds to pursue the Petition for Instructions and to

warn that Jonathan would seek an order compelling Ashbrook to reimburse the Trust for funds wrongfully expended.

## VII. THE LAWSUIT AGAINST JONATHAN, DAVID, AND NOAH

In February 2020, Burns, acting as Arnold's attorney, filed a complaint against Jonathan, David, and Noah for elder abuse, willful misconduct, intentional and negligent infliction of emotional distress, and breach of fiduciary duty, *Arnold Starr v. Jon Starr et al.* (Super. Ct. Orange County, No. 30-2020-01132868) (the elder abuse lawsuit). The complaint in the elder abuse lawsuit alleged, among other things, that Jonathan, David, and Noah "'unilaterally'" changed Arnold's estate plan, verbally and mentally abused and harassed Arnold, harassed Arnold's "personal assistant Sandie Steele," threatened and harassed Arnold's friends and associates, "'wrongfully removed money from [Arnold's] bank accounts,' attempted to 'remove [Arnold] from his home,' and caused Arnold to suffer 'humiliation, severe emotional distress and physical distress.'" Jonathan contends that Arnold was not aware of this lawsuit and never met the attorneys representing him.

Although the elder abuse lawsuit was brought in the name of Arnold as an individual, not the Trust, Ashbrook authorized the distribution of Trust money to fund the lawsuit. The fees were so high — upwards of $130,000 — that Ashbrook decided to put the Julian Farm up for sale to pay the fees. Ashbrook testified at his deposition in July 2020 that he did not think the elder abuse lawsuit was in Arnold's best interest.

## VIII. APPOINTMENT OF A GUARDIAN AD LITEM FOR ARNOLD

Jonathan applied ex parte to have a guardian ad litem appointed for Arnold. On May 11, 2020, the trial court granted the application and appointed W. Rod Stern as guardian ad litem for Arnold in this matter. On May 29, the court in the elder abuse lawsuit also appointed Stern as guardian ad litem for Arnold.

9

On May 29, 2020, Stern submitted a report reflecting several important observations and findings. Stern reported: (1) Arnold wanted to see his children as often as they would be able to visit; (2) nothing provided by Arnold's attorneys suggested that Jonathan, David, or Noah had physically, mentally, or financially mistreated Arnold; (3) Arnold appeared to have significant memory issues rendering him susceptible to undue influence; (4) Arnold appeared to be unaware of any conflict with his children; and (5) Arnold's "'ongoing isolation from family, combined with Thomas Ashbrook's Petition to significantly alter [Arnold's] estate plan based upon an informal, handwritten note suggests that ongoing isolation from family may result in undue influence—intentional or otherwise—by either Sandie Steele or Thomas Ashbrook.'" (Underlining omitted.)

Stern recommended the trial court grant an order to establish visitation rights for Jonathan, David, and Noah on certain terms and conditions. In June 2020, the court adopted the recommendation and entered a visitation order permitting Arnold, in his sole discretion, to initiate visits at any time by placing a telephone call, with no party interfering with the call. The visitation order prohibited discussion of estate planning matters during visits. Since the court made the visitation order, Ashbrook has gone two or three times per week to Arnold's home to visit and during visits discussed litigation-related events.

Stern also submitted a report to inform the court that Arnold was not aware of any lawsuit he had filed against his sons and "'would be surprised to learn he had sued his children.'" Later in June 2020, Stern filed a report in the elder abuse lawsuit. In that report, Stern informed the court that Arnold was not aware of any lawsuit between him and his sons and that Arnold "'would be surprised to find out he had filed a lawsuit against his children.'"

10

## IX. JONATHAN'S PETITION AGAINST ASHBROOK

Jonathan filed the underlying petition against Ashbrook in September 2020. The petition alleged four causes of action: (1) "Suspend Purported Trustee Thomas Ashbrook"; (2) "Enjoin Trustee from Further Breach of Trust"; (3) "Remove Purported Trustee Thomas Ashbrook"; and (4) "Surcharge Purported Trustee Thomas Ashbrook for Breach of Trust." In the fourth cause of action, Jonathan requested that the court surcharge Ashbrook "for all trust monies expended and dissipated since purportedly becoming trustee, including all legal fees expended by Ashbrook as purported trustee in litigating this action and funding [the elder abuse lawsuit]."

Soon after Jonathan's petition was filed, Ashbrook resigned as trustee of the Trust and requested dismissal of the Petition for Instructions. A dismissal of the Petition for Instructions was entered in November 2020. Those actions mooted the first, second, and third causes of action of Jonathan's petition and left only the fourth cause of action, to surcharge Ashbrook.

In October 2020, the parties to the elder abuse lawsuit reached an agreement to settle the case by means of a dismissal with prejudice and mutual releases and waivers of costs. Ashbrook was "fully supportive of the decision to end that litigation."

In November 2020, the trial court ordered an Evidence Code section 730 evaluation of Arnold because "we have lots of proof on this matter that there is a capacity problem." Dr. David Sheffner, who had been appointed to conduct the evaluation, submitted a report to the court in April 2021. Dr. Sheffner's report is confidential and not part of the appellate record; however, it appears from other sources that Dr. Sheffner concluded Arnold lacked capacity.[4]

---

[4] A report filed in May 2020 by Arnold's court appointed attorney, Andrew C. Kemper, stated that Sheffner had concluded that Arnold "likely did not have sufficient capacity to contract."

11

## X.  ASHBROOK'S ANTI-SLAPP MOTION

In November 2020, Ashbrook filed the anti-SLAPP motion that is the subject of this appeal.  Ashbrook moved to strike each cause of action of Jonathan's petition and, in the alternative, to strike various allegations from that petition, including allegations relating to the Petition for Instructions, the elder abuse lawsuit, and expenditure of trust funds to pursue the Petition for Instructions and fund the elder abuse lawsuit.  Ashbrook argued Jonathan was suing him for bringing and funding litigation, which are protected activities under section 425.16(e)(1) and (2) under the litigation privilege of Civil Code section 47, subdivision (b).

In opposition to the anti-SLAPP motion, Jonathan argued the fourth cause of action of his Petition arose out of the unprotected activity of Ashbrook's wrongful spending of trust money to pursue the Petition for Instructions and to fund the elder abuse lawsuit.  In addition, Jonathan argued he had submitted evidence meeting his burden of making a prima facie showing sufficient to sustain a judgment in his favor.

After a hearing, the trial court took the matter under submission and, on June 15, 2021, issued a minute order denying Ashbrook's anti-SLAPP motion.  The trial court concluded that the first, second, and third causes of action of Jonathan's petition were moot.  As to the claims of the fourth cause of action, the court found that two cases—*Gaynor v. Bulen* (2018) 19 Cal.App.5th 864 (*Gaynor*) and *Greco v. Greco* (2016) 2 Cal.App.5th 810 (*Greco*)—were "closely on point."  Following those cases, the court concluded the claims in the fourth cause of action did not arise out of protected activity but were based on allegations that Ashbrook, as trustee, spent trust money in a manner that did not benefit the trust and wasted trust assets without authority to do so.

The trial court next concluded if the claims of the fourth cause of action arose out of protected activity, then Jonathan had submitted admissible evidence to meet his burden of showing his claim that Ashbrook had breached both his duties of care and

12

of loyalty had at least minimal merit. Ashbrook timely appealed from the order denying his anti-SLAPP motion.

MOTIONS

Ashbrook has filed a motion to augment the record with a copy of a minute order entered on June 4, 2021, from the hearing on Ashbrook's anti-SLAPP motion. Ashbrook's motion to augment the record is unopposed. The motion is appropriate (Cal. Rules of Court, rule 8.155(a)), and we grant it.

Jonathan has filed a request for judicial notice of these five documents: (1) minute order entered on May 3, 2021; (2) minute order entered on May 18, 2021; (3) first report of court appointed attorney for Dr. Arnold Starr, filed on May 20, 2021; (4) letters of conservatorship of Arnold Starr, filed on February 4, 2022; and (5) order on petitioner Jonathan Starr's *ex parte* application to approve joint stipulation for resignation of trustee etc., filed on April 6, 2022. Jonathan's request for judicial notice is unopposed.

As for item Nos. 1, 2, and 4, the correct way to make them part of the appellate record is by motion to augment the record, not a request for judicial notice, because they are "document[s] filed or lodged in the case in superior court" before entry of the order that is the subject of this appeal. (Cal. Rules of Court, rule 8.155(a)(1)(A); *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2. [appellate court considers only matters that were part of the record at the time the court entered the judgment].) We therefore treat the request for judicial notice of those three documents as a motion to augment the record under rule 8.155(a)(1) and as such grant the motion. Item Nos. 3 and 5 are records of a court of this state and are therefore proper objects of a request for judicial notice. (Evid Code, §§ 452, subd. (d), 459, subd. (a).)

Jonathan argues the documents of which he requests judicial notice are relevant to show that Arnold lacks capacity and Jonathan has standing to pursue this appeal. We agree the documents are relevant for that purpose. Although a court cannot

13

take judicial notice of hearsay allegations in a court record, it can take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments. (*People v. Franklin* (2016) 63 Cal.4th 261, 280; *Day v. Sharp* (1975) 50 Cal.App.3d 904, 914.) Thus, we can take judicial notice of these facts: The probate court granted a petition or request for appointment of a conservator of the person and estate of Arnold, the court made express or implied findings supporting the appointment of a conservator, and in February 2022, a conservator was appointed and letters of conservatorship were issued.

We also can take judicial notice of the fact that in April 2022 the trial court granted Jonathan's ex parte application to approve the joint stipulation for the resignation of Bruce Hitchman as trustee of the Trust and the succession of Jonathan as Trustee. However, we cannot take judicial notice of the truth of any facts asserted in the declaration offered in support of that ex parte application, or of any facts in the stipulation except for its terms, which were approved in the order granting the ex parte application. (*Espinosa v. Calva* (2008) 169 Cal.App.4th 1393, 1396.)

## DISCUSSION

### I. JONATHAN HAS STANDING TO CHALLENGE ASHBROOK'S ACTIONS AS TRUSTEE

Before addressing the merits, we must resolve the issue of whether Jonathan had standing to challenge Ashbrook's actions as trustee of the Trust. Ashbrook argues Jonathan lacked standing in the trial court, and lacks standing on appeal, because the Trust was revocable, which means Jonathan is merely a contingent beneficiary for whom no fiduciary duties were owed. We agree with Jonathan that he had and has standing.

A revocable trust becomes irrevocable upon the death of the trustor. (*Estate of Giraldin* (2012) 55 Cal.4th 1058, 1062, 1065-1066.) Until a revocable trust

14

becomes irrevocable, a beneficiary's interest is contingent only, and the settlor can eliminate that interest at any time. (*Id.* at p. 1062.)

Under California law a trustee owes a duty to the settlor of the trust and owes no duties to the beneficiary during the period in which a trust is revocable and the settlor is competent. When Jonathan filed his petition, Probate Code former section 15800 read: "Except to the extent that the trust instrument otherwise provides or where the joint action of the settlor and all beneficiaries is required, during the time that a trust is revocable and *the person holding the power to revoke the trust* is competent: [¶] (a) The person holding the power to revoke, and not the beneficiary, has the rights afforded beneficiaries under this division. [¶] (b) The duties of the trustee are owed to the person holding the power to revoke." (*Ibid.*, italics added.)[5]

Therefore, a trustee of a revocable trust owes no duties to a trust beneficiary, and a beneficiary does not have standing to petition the probate court regarding trust administration or the actions of the trustee, unless and until (1) the trust becomes irrevocable under the terms of the trust instrument, (2) the settlor dies, or (3) all persons holding the power to revoke the trust become incompetent. (*Babbitt v. Superior Court* (2016) 246 Cal.App.4th 1135, 1144 ["before a settlor's death (and in the absence of a showing of incompetence), a contingent beneficiary lacks standing to petition the probate court to compel a trustee to account or provide information relating to the revocable trust"].)

---

[5] Legislation in 2021 amended Probate Code section 15800, effective January 1, 2022, such that section 15800, subdivision (a) now reads: "Except to the extent that the trust instrument otherwise provides or where the joint action of the settlor and all beneficiaries is required, during the time that a trust is revocable and *at least one person holding the power to revoke the trust*, in whole or in part, is competent, the following shall apply: [¶] (1) The person holding the power to revoke, and not the beneficiary, has the rights afforded beneficiaries under this division. [¶] (2) The duties of the trustee are owed to the person holding the power to revoke." (Italics added; Stats. 2021, ch. 749, § 1.) Because Arnold is the only person who ever claimed to have had the power to revoke the trust, the 2021 legislation is not material to this appeal.

15

Arnold was alive when Jonathan filed his petition and when the trial court denied Ashbrook's anti-SLAPP motion. Arnold is alive today. Nobody claims the trust has become irrevocable under the terms of the trust instrument.

Thus, Jonathan, as a beneficiary of a revocable trust, would have standing to file and pursue his petition only if Arnold, the person holding the power to revoke the trust, were incompetent when the petition was filed and remains incompetent today. We conclude Jonathan has such standing because in his verified petition he alleged that Arnold was incompetent.

Jonathan's verified petition alleged: "[T]he settlor [of] the Trust is no longer competent and is subject to fraud and undue influence, such that the Trust is now irrevocable." The petition also alleged: "Arnold is currently operating under fraud and undue influence, he lacks legal capacity, and a guardian ad litem has been appointed for Arnold. Therefore, Arnold cannot presently revoke the Trust." The verified petition includes specific factual allegations supporting the ultimate factual allegation that Arnold was and is incompetent.

The allegations of Jonathan's petition are sufficient to confer standing on Jonathan, subject to his ability to meet his ultimate burden of proving Arnold's incompetence. In reaching this conclusion we agree with and follow *Drake v. Pinkham* (2013) 217 Cal.App.4th 400, 408-409. In *Drake*, the plaintiff brought a petition to invalidate two amendments to a revocable trust, for imposition of a construction trust, and for damages. (*Id.* at p. 403.) The trial court granted summary judgment in favor of the defendants. (*Id.* at p. 402.) The Court of Appeal affirmed based on laches; that is, the plaintiff unreasonably delayed in bringing her claims. (*Id*. at pp. 403, 406.) Although the plaintiff was not a trust beneficiary, and the trust settlor was alive, the plaintiff had alleged the settlor was incompetent, and those allegations conferred standing on the plaintiff. After examining Probate Code sections 17200 and 15800 and the Law Revision Commission comments to them (*Drake*, at p. 408), the Court of Appeal concluded the

16

plaintiff would have "'the usual rights of trust beneficiaries' if, as she alleges, [the settlor] was incompetent." (*Id*. at p. 409.) "Thus, nothing in section[] 17200 or 15800 precluded her from bringing the underlying action prior to [the settlor]'s death. That she would have had the burden of proving [the settlor]'s incompetence to establish her standing to pursue those claims does not excuse her delay." (*Ibid.*)

In *Barefoot v. Jennings* (2020) 8 Cal.5th 822, the plaintiff filed a probate petition alleging trust amendments disinheriting her were invalid on the grounds of incompetence, undue influence, or fraud. (*Id*. at p. 826.) The Court of Appeal had concluded the plaintiff lacked standing to bring a petition under Probate Code section 17200 challenging the validity of the amendments because she was no longer a named beneficiary. (*Barefoot*, at p. 825.) The California Supreme Court disagreed with the Court of Appeal and concluded that "the Probate Code grants standing in probate court to individuals who claim that trust amendments eliminating their beneficiary status arose from incompetence, undue influence, or fraud." (*Ibid*.) The court noted: "[W]hen a demurrer or pretrial motion to dismiss challenges a complaint on standing grounds, the court may not simply assume the allegations supporting standing lack merit and dismiss the complaint. Instead, the court must first determine standing by treating the properly pled allegations as true. If, having taken the allegations as true, the court finds no standing, it should sustain the demurrer or dismiss the petition. If it finds standing by contrast, the court should allow the litigation to continue." (*Id.* at p. 827.)

Ashbrook's challenge to Jonathan's standing is the equivalent of a demurrer or pretrial motion to dismiss. Jonathan's allegations that Arnold is incompetent, accepted as true, support Jonathan's standing to bring the petition. Jonathan must, at some point, prove Arnold's incompetence, but that is for a later day.

Ashbrook also asserts lack of standing as a reason why, at the second step of the anti-SLAPP analysis, Jonathan cannot meet his burden of making a prima facie factual showing that his petition has merit. Allegations in a pleading, even if verified,

17

cannot satisfy that burden.  (*Newport Harbor Offices & Marina, LLC v. Morris Cerullo World Evangelism* (2018) 23 Cal.App.5th 28, 49.)  But we do not reach the second step of the anti-SLAPP analysis because we conclude the surcharge cause of action does not arise out of allegations of protected activity.

Jonathan has submitted evidence to support a finding that Arnold has continued to be incompetent since the appointment of the guardian ad litem.  We have granted Jonathan's request for judicial notice, which requested notice of letters of conservatorship of the person and estate of Arnold.  "A conservator of the estate may be appointed" if the conservatee is substantially unable to manage the conservatee's financial resources or resist fraud or undue influence.  (Prob. Code, § 1801, subd. (b).)  The letters of conservatorship were filed in February 2022.  Jonathan also requested we take judicial notice of the first report of Arnold's court-appointed attorney, Andrew C. Kemper, which was filed in May 2021.  In the report, Kemper offered his opinion that Arnold was not able to understand the rights, duties, and responsibilities related to Jonathan's petition, was not able to communicate with or direct his attorney regarding that petition and was unable to understand the probable consequences of any decisions he might make regarding the petition.  Kemper concluded that Arnold appeared to be unaware of the allegations of the elder abuse lawsuit or even of its existence.  We cannot take judicial notice of the truth of those assertions (*Espinosa v. Calva, supra*, 169 Cal.App.4th at p. 1396); however, we can take judicial notice of the facts that Kemper did file a report with the court and in that report made those comments and reached those conclusions.  Even though we cannot accept those comments and conclusions as true, the fact they were made supports a finding that Arnold lacked capacity as of May 2021.

18

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16(b)(1).) "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

Anti-SLAPP motions are resolved through a two-step analysis. (*Baral, supra*, 1 Cal.5th at p. 384.) At the first step, the defendant must establish the challenged allegations or claims arise out of activity protected under section 425.16. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*); *Baral,* at p. 384.) "At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." (*Baral,* at p. 396.) After identifying the allegations of protected activity, the defendant must demonstrate the activity alleged falls within one of the four categories described in section 425.16(e).[6] (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 620 (*Rand*).) In addition to the pleadings, the court may consider declarations and other

_____

[6] The four categories are: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16(e).)

19

evidence presented in order to determine what conduct is being challenged, but not to assess the merit of the claims.  (*Joslin v. Third Laguna Hills Mutual, supra*, 49 Cal.App.5th at p. 371; *Coretronic Corp. v. Cozen O'Connor, supra*, 192 Cal.App.4th at pp. 1389-1390.)

If the defendant meets this burden, then, at the second step, the burden shifts to the plaintiff to demonstrate the claims have at least "'minimal merit'" (*Park, supra*, 2 Cal.5th at p. 1061) by making "a prima facie factual showing sufficient to sustain a favorable judgment" (*Baral, supra*, 1 Cal.5th at p. 385; *id*. at p. 396).

"We review an order granting or denying an anti-SLAPP motion under the de novo standard and, in so doing, conduct the same two-step process to determine whether as a matter of law the defendant met its burden of showing the challenged claim arose out of protected activity and, if so, whether the plaintiff met its burden of showing probability of success." (*Newport Harbor Offices & Marina, LLC v. Morris Cerullo World Evangelism* (2018) 23 Cal.App.5th 28, 42.)

## III.  THE CLAIMS OF THE SURCHARGE CAUSE OF ACTION DO NOT ARISE OUT OF PROTECTED ACTIVITY

### A. *The Surcharge Cause of Action's Claims Arise Out of Allegations Ashbrook Wasted and Misused Trust Assets*

To be subject to an anti-SLAPP motion, a claim must arise out of constitutionally protected activity.  (§ 425.16(b)(1).)  "A claim arises from protected activity when that activity underlies or forms the basis for the claim."  (*Park, supra*, 2 Cal.5th at p. 1062.)  "Critically, 'the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech.'" (*Id*. at p. 1063.)  "[A] claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of" (*id*. at p. 1060) and that "the focus is on determining what

'the defendant's activity [is] that gives rise to his or her asserted liability . . . ." (*Id*. at p. 1063.)

Jonathan and Ashbrook have opposing views of what conduct underlies or forms the basis for the surcharge claims. Jonathan argues the conduct underlying or forming the basis for the surcharge claim is Ashbrook's misuse and waste of trust money, which are breaches of trust and not protected activity under section 425.16(e). According to Jonathan, "[t]he gist of [the breach of trust] claim centers on surcharge: Ashbrook's repayment to the trust of monies he improperly spent as a 'trustee,' when Ashbrook was never supposed to serve as trustee under the trust instrument itself." Ashbrook argues the conduct underlying or forming the basis for the surcharge claim is his pursuit of the Petition for Instructions and use of trust assets to fund the elder abuse lawsuit, which are protected litigation activities under section 425.16(e)(1) and (2). According to Ashbrook, the surcharge cause of action "is based entirely upon the litigation of Dr. Starr's elder abuse lawsuit and Dr. Ashbrook's petition for instructions . . . ."

To determine whether the surcharge claim arises out of protected activity, we start by "consider[ing] the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Park, supra*, 2 Cal.5th at p. 1063.) To recover a surcharge against a trustee for breach of trust, the beneficiary has the burden of proving (1) the existence of a fiduciary relationship, (2) breach of that relationship, and (3) damage proximately caused by the breach. (*Oates v. City of Lincoln* (2001) 93 Cal.App.4th 25, 35; *LaMonte v. Sanwa Bank of California* (1996) 45 Cal.App.4th 509, 517.)[7] The actions by Ashbrook that supply the elements and form the basis for liability are alleged in paragraph 165 of Jonathan's petition. Those allegations include: (1) "[Ashbrook] is pursuing this meritless Petition for Instruction to confirm that a handwritten note is an amendment to the Trust, even though Arnold clearly

_____

    [7] The elements of a cause of action for breach of fiduciary duty are the same. (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1509.)

21

did not have capacity to amend the trust"; (2) "[Ashbrook] is actively funding litigation filed by an attorney on behalf of Arnold, even though Arnold is not aware of the litigation, may not even know the attorney prosecuting the action, and Ashbrook concedes the litigation is not in Arnold's best interests"; (3) "[Ashbrook] is bleeding the trust of money by funding litigation that is meritless and not in Arnold's best interests"; and (4) "[Ashbrook] is attempting to liquidate trust assets, including Arnold's family farm, to fund litigation that he concedes is not in Arnold's best interests."

At first glance, those actions appear to constitute the constitutionally protected activities of filing and pursuing the Petition for Instructions and using trust assets to fund the elder abuse lawsuit. "'Any act'" under section 425.16 includes "the filing, funding, and prosecution of a civil action." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Closer analysis leads us to conclude that the basis of liability is not the filing and funding of litigation, but is, as Jonathan contends, the waste and misuse of trust money "when Ashbrook was never supposed to serve as trustee under the trust instrument itself." As *Park* teaches, the determinative issue is whether "the speech or petitioning activity *itself* is the wrong complained of" (*Park*, *supra*, 2 Cal.5th at p. 1060) and that "the focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability." (*Id.* at p. 1063.) Phrased another way, does the "'core injury-producing conduct upon which the claim is premised'" arise out of protected activity? (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 594.)

The core injury-producing conduct asserted by Jonathan in the surcharge cause of action is the waste and misuse of trust assets. Jonathan does not allege that either the Petition for Instructions or the elder abuse lawsuit *in itself* produced the injury or gave rise to liability. The injury allegedly suffered is the loss of trust assets and the reduction of the trust corpus, and that injury was produced by the waste and misuse of those assets by Ashbrook, whom Jonathan alleged was never supposed to serve as trustee. The Petition for Instructions and the elder abuse lawsuit merely serve as evidentiary

22

support for Jonathan's claim. (*Park, supra*, 2 Cal.5th at p. 1065.) Jonathan also alleged that Ashbrook engaged in a plan to isolate Arnold from his children and grandchildren, relied on Arnold to make decisions, violated a court order regarding visitation, and forced Arnold to change legal, accounting, and finance professional. The Petition for Instructions and the elder abuse litigation were allegedly manifestations of or part of Ashbrook's plan to isolate Arnold.

Jonathan's surcharge claim is expressly based on Probate Code provisions requiring the trustee to administer the trust solely in the interest of the beneficiaries (Prob. Code, § 16002), without a conflict of interest (Prob. Code, § 16004, subd. (a)), by taking reasonable steps to take, keep control of, and preserve trust property (Prob. Code, § 16006), and with reasonable care, skill, and caution (Prob. Code, § 16040, subd. (a)). A trustee has a duty "to administer the trust solely in the interest of the beneficiaries" (Prob. Code, § 16002, subd. (a)) and only to incur and pay legal expenses that are "'reasonable' in amount and 'appropriate' to the 'purposes and circumstances of the trust'" (*Donahue v. Donahue* (2010) 182 Cal.App.4th 259, 268). The essence of Jonathan's surcharge cause of action is that Ashbrook violated those duties by wasting and misusing trust assets. Misconduct in the administration of a trust and preservation of trust assets is not action "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution." (§ 425.16(b)(1).)

B. *Analogous Opinions Supporting Our Conclusion*

Three analogous Court of Appeal decisions support our conclusion that the surcharge cause of action does not arise out of activity protected under section 425.16. In *Greco*, *supra*, 2 Cal.App.5th 810, a beneficiary of her deceased parents' trust and estates sued her brother, who was the trustee and administrator of the estates, in civil court for elder abuse and in probate court for breach of fiduciary duty. (*Id.* at pp. 816-817.) In both lawsuits, the beneficiary alleged the brother had used trust and estate funds to pursue

litigation against their sister that was both in bad faith and not in the best interest of the trust or the estates. (*Ibid.*) The beneficiary alleged the brother had breached his "'duty to act with utmost good faith . . . , the duty of loyalty . . . , the duty to treat all beneficiaries equally . . . , the duty to act according to the Trust and Estates documents, the duty to avoid self-dealing . . . , and the duty to avoid conflicts of interest.'" (*Id.* at p. 817.) In the breach of fiduciary duty claim, the beneficiary alleged her brother had "'engaged in a course of conduct . . . fomenting litigation and other wrongful acts, against . . . beneficiaries of the Trust and/or estate, in an attempt to disinherit them . . . and/or prevent questioning of his actions.'" (*Ibid.*) The brother responded by filing anti-SLAPP motions in which he asserted the beneficiary's claims "arose from actions and communications in the underlying litigation and therefore were protected activity . . . ." (*Id.* at p. 818.) The beneficiary argued in opposition to the motion that "the gravamen of the [claims] was that by taking money to pursue his personal vendetta, [the brother] wrongfully took money in breach of his fiduciary duties." (*Ibid.*) Supporting declarations showed the brother had withdrawn a substantial amount of money from the trust corpus and the estates to fund the underlying litigation. (*Ibid.*)

Both the trial court and the probate court denied the respective anti-SLAPP motions on the ground the "gravamen" of the beneficiary's claim was that the brother had converted money from the trust and the estates to fund litigation against family members. (*Greco, supra*, 2 Cal.App.5th at pp. 818-819.) The Court of Appeal affirmed on the breach of fiduciary duty and elder abuse claims. (*Id.* at pp. 821-825.) On the elder abuse claim, the court concluded: "[I]t was [the brother's] withdrawal of the funds from the trust and estates that was the alleged wrongful act . . . . Although [the beneficiary] did allege the underlying lawsuits were wrongful, her claim for recovery was not based on the wrongful act of pursuing meritless or wasteful litigation, but on taking trust and estate funds." (*Id.* at p. 823.) The court explained: "The *activity* that gave rise to [the brother]'s asserted liability was the taking. . . . Funding the litigation solely to pursue a

24

vendetta was the reason the activity (i.e., the taking) was allegedly wrongful . . . . The test under section 425.16 focuses on . . . 'the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' [Citation.] [¶] The taking, whether or not it is actually wrongful and why, does not fall within any of the conduct described in subdivision (e) of section 425.16." (*Id*. at pp. 823-824.)

The *Greco* court applied similar reasoning to affirm denial of the anti-SLAPP motion on the breach of fiduciary duty claims. (*Greco, supra*, 2 Cal.App.5th at pp. 824-825; *id*. at p. 825.) The probate court had commented the allegations that the brother took money from the trust and estates to "foment[] litigation" (*id*. at p. 818) did "appear to challenge the bringing of the underlying litigation, a protected activity" (*id.* at p. 824). However, the beneficiary had alleged the acts that caused the injury were limited to wrongfully taking, concealing, and disposing of property belonging to the trust and the estates. (*Id.* at p. 825.) "Thus, the gravamen of this cause of action for purposes of section 425.16 is the taking itself, not the reason for the taking which is alleged to have made the taking wrongful." (*Ibid*.)

Although *Greco* was filed before *Park*, *Greco*'s holding is consistent with that decision. The *Greco* court focused on the factual bases for the claims and concluded the injury-producing activity was not the alleged wrongful filing of the lawsuits. The *Greco* court used the outmoded word "gravamen" but for the still relevant purpose of "determin[ing] whether particular acts alleged within the cause of action supply the elements of a claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1012.)

The second case, *Gaynor, supra*, 19 Cal.App.5th 864, arose out of a surcharge petition filed by trust beneficiaries against the trust's de facto trustee and cotrustees (the trustees). In the surcharge petition, the beneficiaries alleged, among other things, that in order to implement a plan to benefit one class of beneficiaries over another, the trustees "wrongfully withdrew Trust assets and then used these assets to file and

25

defend probate petitions in attempting to persuade the probate court to adopt their plan." (*Id*. at p. 869.) The beneficiaries alleged the trustees violated their duties of loyalty and fair treatment by wasting trust assets on various probate petitions. (*Id*. at p. 879.) The trustees brought an anti-SLAPP motion to strike from the surcharge petition claims based on the allegations of prior probate litigation. (*Id.* at pp. 869, 879.)

The trial court denied the anti-SLAPP motion, and the Court of Appeal affirmed. (*Gaynor, supra*, 19 Cal.App.5th at pp. 869, 875-876.) The Court of Appeal concluded the surcharge petition did not arise out of protected activity because "that Trust assets were improperly used on the probate litigation was not a separate legal claim, but merely reflected the manner in which the [trustees] implemented their alleged wrongful plan to alter the trustee succession rules to favor their own interests." (*Id.* at p. 879.)

The court also treated the "'wasting trust assets'" allegations as a separate claim and acknowledged that filing probate petitions, motions, and briefs in court constituted protected activity. (*Gaynor, supra*, 19 Cal.App.5th at p. 880.) But treated as a separate claim, the wasting trust asset allegations were not based on protected litigation because the trustees filed their petitions as part of a plan to change succession rules to permit the trustees to operate the trust to the advantage of a portion of the beneficiaries. (*Ibid.*) "Thus, the activity giving rise to the . . . beneficiaries' alleged harm was the breach of loyalty in formulating and pursuing this plan and the improper use of Trust assets to wrongfully benefit [the trustees]. Although the alleged breach of loyalty may have been carried out by the filing of probate petitions, it was not the petitioning activity itself that is the basis for the breach of fiduciary claim. [Citation.] The litigation activities (e.g., the filing and/or defense of the Petitions to Modify, Appoint, and Construe) would provide *evidence* of the alleged breaches of fiduciary duty, but the filing of these petitions was not necessary to establish this portion of the breach of fiduciary duty claim." (*Ibid*.)

26

The *Gaynor* court also found it to be significant that the beneficiaries' breach of fiduciary duty claim was expressly based on statutes requiring a trustee to administer the trust according to the trust instrument (Prob. Code, § 16000), solely in the interest of the beneficiaries (Prob. Code, § 16002), without conflict of interest (Prob. Code, § 16004), and to control and preserve trust property (Prob. Code, § 16006; *Gaynor, supra*, 19 Cal.App.5th at p. 882). The trustees allegedly violated those code sections by withdrawing trust assets and using them for improper purposes. (*Gaynor*, at p. 882.)

The *Gaynor* court rejected the trustees' argument that funding the probate litigation was protected conduct. (*Gaynor, supra*, 19 Cal.App.5th at p. 886.) The court concluded that funding litigation, if at all protected, was protected under section 425.16(e)(4) which, as in the present case, was not in issue. Further, even if funding litigation were protected under section 425.16(e)(2), the beneficiaries claims did not arise out of funding litigation, but out of misuse of trust assets. (*Gaynor,* at pp. 886-887.)

In the present case, Jonathan's surcharge cause of action is remarkably similar to the breach of fiduciary duty and elder abuse claims in *Greco* and the surcharge claim in *Gaynor*. Jonathan's surcharge cause of action is limited to Ashbrook's alleged waste and misuse of trust assets and is based on Probate Code sections concerning trust administration. Jonathan does not allege the Petition for Instructions or funding the elder abuse lawsuit caused any injury. Just as the brother in *Greco* was alleged to have pursued litigation to carry out a vendetta, and the trustees in *Gaynor* were alleged to have pursued litigation to implement a plan to benefit one class of beneficiaries over another, so Ashbrook is alleged to have pursued the Petition for Instructions and used trust assets to fund the elder abuse lawsuit to implement a plan to isolate Arnold from his family. It is "not the petitioning activity itself that is the basis for" Jonathan's surcharge cause of action (*Gaynor, supra*, 19 Cal.App.5th at p. 880); rather, pursuing the Petition for Instructions and funding the elder abuse lawsuit were "the reason" those activities were

27

wrongful (*Greco, supra*, 2 Cal.App.5th at p. 824) and provided "*evidence* of the alleged breaches of fiduciary duty" (*Gaynor*, at p. 880).

In addition to *Greco* and *Gaynor*, the recent case of *Manlin v. Milner* (2022) 82 Cal.App.5th 1004 (*Manlin*) supports our conclusion that the surcharge allegations do not arise out of protected activity. In *Manlin*, the cross-complainant alleged that the cross-defendant, the managing member of several limited liability corporations, had breached fiduciary duties by diverting corporate assets to pay his own legal expenses and to fund litigation against the cross-complainant. (*Id*. at p. 1010.) The trial court granted the cross-defendant's anti-SLAPP motion. (*Id*. at p. 1009.) The Court of Appeal reversed. (*Id*. at p. 1010.) The court concluded the breach of fiduciary duty claim arose did not arise out of allegations of protected activity because, "the element of [the cross-complainant]'s claim for breach of fiduciary duty is the self-dealing act of diverting funds from the LLCs in which [the cross-defendant] owns an interest." (*Id*. at pp. 1019-1020.) The court reasoned that the cross-defendant's breach of fiduciary duty claim was based "only on the diversion itself and whether it constituted self-dealing" and did not depend on "the purpose for that diversion." (*Id*. at p. 1020.) "The protected use to which cross-defendants put the diverted funds may supply evidence of the selfishness of their self-dealing but does not convert the use itself into the basis for liability." (*Ibid.*)

Ashbrook attempts to distinguish *Gaynor* on the ground that he, unlike the trustees in that case, was not trying to enrich himself or place himself at an advantage to the detriment of the beneficiaries. At oral argument, Ashbrook's counsel argued *Manlin* was similarly distinguishable because in that case the court stated, "The allegation that the cross-defendants engaged in this self-dealing *completes* the claim." (*Manlin, supra*, 82 Cal.App.5th at p. 1020, italics added.)

It is undisputed that Ashbrook served as trustee without compensation and without taking steps to secure compensation. But as noted above, Jonathan does allege that "Ashbrook was never supposed to serve as trustee under the trust instrument itself."

28

And Ashbrook's motives, whether innocent or malicious, are not relevant to the question whether the surcharge cause of action arises out of protected activity. (See *Greco, supra*, 2 Cal.App.5th at p. 822 [the trustee's "alleged motive for taking the funds . . . is irrelevant"]; *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 94 ["Courts must be careful to distinguish allegations of conduct on which liability is based from allegations of motives for such conduct"].)

Further, as we read the surcharge cause of action, Jonathan is not alleging that Ashbrook breached his fiduciary duties by engaging in self-dealing. Instead, the surcharge cause of action alleges that Ashbrook breached his fiduciary duties by wasting and mismanaging trust assets; that is, he failed to "administer the trust with reasonable care, skill, and caution under the circumstances then prevailing (Prob. Code, § 16040, subd. (a)), "take reasonable steps under the circumstances to take and keep control of and to preserve the trust property" (Prob. Code, § 16006), and "not to use or deal with trust property . . . for any other purpose unconnected with the trust" (Prob. Code § 16004, subd. (a)). Ashbrook's liability is not dependent upon his motives or whether he sought a personal advantage. (See *White v. Citizens Nat. T. & S. Bank* (1941) 46 Cal.App.2d 418, 422 ["a violation by a trustee of a duty which equity lays upon him, whether fraudulent or through negligence, or arising through mere oversight or forgetfulness, is a breach of trust"].)

Ashbrook also tries to distinguish *Gaynor* on the ground Jonathan is a contingent beneficiary while the beneficiaries in that case were not. We have concluded, however, that Jonathan has standing to challenge Ashbrook's actions, and Ashbrook owed fiduciaries duties to Jonathan, based on the allegations of Jonathan's petition.

29

C. *Other Arguments and Considerations*

Ashbrook argues that use of trust assets to fund the elder abuse lawsuit was protected activity because "'[a]ny act'" in furtherance of the person's right of petition or free speech under section 425.16(b)(1) "includes communicative conduct such as the filing, *funding*, and prosecution of a civil action." (*Rusheen v. Cohen, supra*, 37 Cal.4th at p. 1056, italics added.) As we have concluded, the surcharge cause of action arises out of allegations that Ashbrook wasted and misused the Trust's assets, which is not communicative conduct.

Ashbrook also argues a trustee should not have to face a lawsuit for bringing a petition for instructions from which the trustee will not benefit. As we have explained, the gist of Jonathan's surcharge cause of action is that Ashbrook misused and wasted trust assets in violation of his fiduciary duties. Ashbrook is responsible for his actions undertaken as trustee whether or not he benefitted from them.

In reaching our conclusions, we are mindful, as was the *Gaynor* court, of "carefully applying" the "'arising from'" standard of *Park* "to ensure the legislative intent underlying the anti-SLAPP statute is effectuated." (*Gaynor, supra*, 19 Cal.App.5th at p. 887.) The *Gaynor* court expressed concern that "[h]olding that a trust beneficiary's surcharge petition is subject to an anti-SLAPP petition whenever a beneficiary challenges the trustee's use of trust assets to fund self-serving litigation would significantly deter beneficiaries from bringing such actions." (*Ibid.*) "If a fiduciary could strike breach of duty claims at the pleading stage . . . this would substantially burden a *beneficiary's* constitutional petition rights and undermine the Probate Code protections for beneficiaries, thereby reducing the probate court's ability to monitor trustee activities." (*Ibid.*)

We agree with *Gaynor* and take the analysis one step further. Characterizing a trustee's use of trust assets to bring or fund unnecessary litigation as protected activities under section 425.16(b)(1) might have the effect not only of deterring

30

beneficiaries from bringing surcharge petitions, but of providing trustees complete immunity for wasting trust assets on pointless litigation. The litigation privilege of Civil Code section 47, subdivision (b) raises a bar of absolute immunity for communicative conduct relating to litigation. (See *Rusheen v. Cohen, supra*, 37 Cal.4th at p. 1057.) Filing civil litigation is communicative conduct protected by the litigation privilege. (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1249.) Funding civil litigation is considered to be communicative conduct for purposes of section 425.16 (*Greco, supra*, 2 Cal.App.5th at p. 821) and, therefore, would likely constitute protected, communicative activity for purposes of the litigation privilege (see *Dziubla v. Piazza* (2020) 59 Cal.App.5th 140, 155-156 [soliciting funds to pay for litigation comes within litigation privilege]). As a consequence, a trustee's misuse of trust assets to file and fund litigation, if deemed to be protected petitioning activity, might also be absolutely protected by the litigation privilege, which would leave a beneficiary with no recourse against a maleficent trustee.

## DISPOSITION

The order denying Ashbrook's anti-SLAPP motion is affirmed. Jonathan shall recover costs on appeal.

SANCHEZ, ACTING P. J.

WE CONCUR:

DELANEY, J.

MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

31

Filed 1/26/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JONATHAN STARR, | |
| Plaintiff and Respondent, | G060597 |
| v. | (Super. Ct. No. 30-2019-01117553) |
| M. THOMAS ASHBROOK, as Trustee, etc. | ORDER GRANTING REQUEST FOR PUBLICATION; MODIFICATION OF OPINION AND DENIAL OF PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

Respondent has requested that our opinion, filed on January 3, 2023, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED. This opinion is ordered published in the Official Reports as modified by the following order.

It is hereby ordered that the opinion be modified as follows:

On page 6, first sentence of the last paragraph the words "replaced Powell with" are replaced with "retained another attorney," so the sentence reads:

In April 2019, Arnold retained a new estate planning attorney, Mark Powell, and in July 2019 retained another attorney, Nigel Burns.

On page 11, first line of footnote 4, "2020" is changed to "2021."

On page 18, the first full paragraph, beginning "Jonathan has submitted" is deleted and the following paragraph is inserted in its place:

Our opinion must not be read as making any sort of finding or determination on the issue of Arnold's competence at any point in time.  We are concluding only that the allegations of Jonathan's petition are sufficient to confer standing."

There is no change in the judgment.

The petition for rehearing is DENIED.


SANCHEZ, ACTING P. J.

I CONCUR:


DELANEY, J.


2